MERCHANTS' & MINERS' TRANSP. CO. v. HOPKINS et al.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1901.)

No. 395.

1. Collision—Steamer and Sailing Vessel—Presumption of Fault.

In case of a collision at sea between a steamer and a sailing vessel, the presumption is that the steamer was in fault, since it was her duty to keep out of the way; and the burden rests upon her to rebut such presumption by evidence showing that she kept an efficient lookout, and took all reasonable precautions to prevent the collision.

2. Same—Contributory Fault of Schooner.

A schooner cannot be held in fault for a collision with a steamer because after she had been placed in a position of peril through the fault of the steamer, and after collision had become inevitable, she changed her course for the purpose of easing the blow.

3. SAME—VIOLATION OF RULES—FAILURE TO SOUND FOG HORN.
Under the navigation rules (26 Stat. 320), which require sailing vessels to use the fog horn "in fog, mist, falling snow or heavy rain storm, whether by day or night," a schooner which fails to observe such requirement while sailing before a 60-mile wind on a dark and rainy night must be held guilty of contributory fault for a collision with a meeting steamer, unless it affirmatively appears that the neglect could not have contributed to the disaster.[1]

Appeal from the District Court of the United States for the Eastern District of Virginia.

Robert M. Hughes (Daniel H. Hayne, on the brief), for appellant.
Edward R. Baird, Jr., for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

SIMONTON, Circuit Judge. A libel was filed in the district court of the United States for the Eastern district of Virginia by the owners of the schooner Darlington against the Merchants' & Miners' Transportation Company, claimant of the steamship Howard, because of a collision between the schooner and steamship. The claimant answered. The evidence on behalf of libelant was taken by deposition out of court. The claimant offered no testimony. The court below hearing the cause entered a decree for libelant in the sum of $3,193.72, with interest from April 1, 1900, and costs, but filed no opinion stating the grounds for decree. Claimant excepted, and the cause is here on appeal.

It is to be regretted that we are not assisted in deciding this appeal by the reasons of the learned judge who heard the case below. It is still more to be regretted that there is in the testimony no evidence on the part of the claimant showing how, from its standpoint, the collision occurred. Collisions at sea, involving as they do loss of life and of property, have received special attention of all maritime nations. They have by mutual consent adopted and proclaimed an elaborate system of rules, whose purpose is not only to prevent collisions at sea, but to compel an avoidance of all risk of collision. Every case of collision which comes before the courts is an object lesson, requiring the construction and application of these rules. In passing upon it, the courts inquire whether there was a violation of these rules, how such violation could be avoided, or what will excuse such violation. From these decisions seafaring men learn the theory and practice of the law of collision. It is therefore of supreme importance that in each case all the facts should be brought out; that the parties to the collision should detail these facts from their standpoint, so that the court can give full consideration to the rule, and a clear application of the facts thereto. More especially is this desirable when the collision is between a steamer and a sailing vessel. Of course, counsel are the best judges of the conduct of their case, and, if they prefer not to risk the evidence of their own witnesses, no one can complain. But the court, in reach-

---

[1] Collision rules, see notes to The Niagara, 28 C. C. A. 532; The Mt. Hope, 29 C. C. A. 368.

ing its conclusion, cannot but realize that they do this with but a part of the case disclosed to it.

The schooner Kate Darlington, of 128 tons burden, and in ballast, on October 30, 1899, was on her voyage from Atlantic City, N. J., to the port of Norfolk. Including the captain, she had a crew of five men. She was tight, staunch, and properly equipped. On the afternoon of that day she encountered a stiff gale from northeast, which gradually increased in violence. Her foresail was closely reefed and set, the mainsail doubly reefed and tied up, the flying and main jibs taken in and tied up, and the vessel run under reefed fore sail and fore stay sail. About 9 o'clock p. m. she sighted Cape Charles lightship, passed Cape Charles, and headed into Chesapeake Bay, towards Cape Henry. Her course was W. S. W. About 11 o'clock p. m. the lookout reported a steamship a little on the starboard bow of the schooner. She was then showing both red and green lights, as if she was going head on to the schooner. Then she shut in the green light, showing only the red light, and then there was the collision. The collision occurred just about 30 feet from the stern of the steamship; the schooner striking a glancing blow, causing little or no damage to the steamship, but tearing away the bowsprit and head gear of the schooner. Immediately after the collision the steamer blew her whistles, and apparently changed her course, and went in the direction of the schooner. But in the darkness the schooner had disappeared, and each vessel went on its way. The steamship blew no whistle as she was approaching the schooner. The schooner did not blow her fog horn. The night was dark, wind blowing about 60 miles an hour, raining very heavily, and misty.

The question is, who was in fault? We have no means of ascertaining what was done on the steamship,—whether she had any lookout; whether, if she had, was it efficient; when she first saw the schooner; what precautions she took. All of these questions but the last find no answer in the testimony. The last is left to conjecture. Nor are these questions unimportant. When a steamer approaches a sailing vessel she is required to exercise the necessary precautions to avoid the risk of a collision, and, if this be not done, prima facie the steamer is chargeable with fault. The Scotia, 14 Wall. 170, 20. L. Ed. 822; Steamship Co. v. Rumball, 21 How. 372, 16 L. Ed. 144. The witnesses for the libelant say that when they first saw the steamship she showed a white light, and then both red and green lights were seen. Very soon she shut out the green light, and showed only the red. The inference from this is that she ported her helm. This is all. Now, nautical rules require that, when a steamship and sailing vessel are approaching each other from opposite directions or on intersecting lines, the steamship, from the moment the sailing vessel is seen, shall watch with the highest diligence her course and movements, so as to be able to adopt such timely measures of precaution as will necessarily prevent the two vessels from coming in contact. Porting the helm a point when the light of the sailing vessel is first observed, and then waiting until a collision is imminent before doing anything further, do not

satisfy the requirements of law. The Carroll, 8 Wall. 302, 19 L. Ed. 392. It has not been shown on the part of the steamship when and how the lights of the sailing vessel were observed. It is to be inferred that they were seen as she ported. That is the only inference to be drawn. She certainly did not avoid the collision. When the steamship saw the lights of the schooner and ported, she must have known that she would cross the course of the latter. She had a right to do this, instead of going under her stern, which was the safer way. But when she took this course she took the risk, and must suffer the consequence. Mars. Mar. Coll. (2d Ed.) 362. It is the duty of the steamer to keep out of the way of the sailing vessel, giving her a wide berth, and so avoiding not only the collision, but the risk of collision. The Louisiana v. Fisher, 21 How. 1, 16 L. Ed. 29; article 20, International Rules of Navigation (23 Stat. 442).

As to the schooner: The story as told by her witnesses is that they first observed the steamer showing her white light, and then her green and red lights, a little on the starboard bow of the schooner; that very soon the steamer shut in her green light, showing only the red, and that almost immediately she was seen bearing down on the schooner; that the master of the schooner, fearing collision, and being certain that it would happen, gave orders to the man at the helm to starboard the wheel; that this was done to ease the blow. Then came the collision. In estimating the time between the discovery of the steamer's lights and the collision, the witnesses vary. Barnes, a deck hand, says, the port light was showing a minute or minute and a half. Payne, the mate, says, "Not over two minutes, probably three." But he also says "that the red light was just under our bow," and "the steamer changed her course, shutting in the green light and showing her red light only just before the collision, and immediately after that the collision occurred." The master of the schooner estimates that it was something like a minute to a minute and a half between the time when the green light on the steamer was shut in and only the red light was seen, and the occurrence of the collision. Barnes estimates the distance between the two vessels when the lights were first seen at about 100 yards. The master of the schooner says, in answer to a question as to the distance between the vessels when the lights were first observed: "It might have been half a mile. I would say a half mile off, if I had to say something." Just before the collision the schooner changed her course. The mate, who was at the wheel, says this was not done until they saw that there was no chance of avoiding the collision. It is very evident from this testimony that the interval between the first discovery of the steamship and the collision was very short. The witnesses attempt to estimate the time, but estimates of this sort are necessarily more or less uncertain. The Stephen Morgan, 94 U. S. 601, 24 L. Ed. 266. All agree that they saw the steamship bearing right down on the schooner, and that the change of course of the latter was to lighten the blow. The answer of the respondent admits that the schooner with which she collided "lightly struck the steamer on her port quarter." The maneuver of the schooner accomplished its purpose. "The

steamship being under obligation to keep out of the way of the schooner, did not do so. It approached too close to her. The steamer therefore is to blame for suffering this peril to occur; for, if it be conceded that the schooner was wrong in starboarding her helm, this cannot affect her right to recover, if she be in other respects without fault, because the steamer, having the right of way, put her in this predicament, and must answer the consequences." The Carroll, 8 Wall. 305, 306, 19 L. Ed. 392; The Falcon, 19 Wall. 76, 22 L. Ed. 98. But it cannot be said that the schooner was wholly without fault. All the testimony shows that the night was dark, the rain very heavy, and the atmosphere misty. The present international rules require sailing vessels to use the fog horn "in fog, mist, falling snow or heavy rain storm, whether by day or night." The old rule (Rev. St. § 4233) required the signal to be given in fog or thick weather. The first revision (1885; 23 Stat. 438) made it in fog, mist, or falling snow. The last revision (26 Stat. 320) added "heavy rain storms." This rule is imperative, and was not observed by the schooner. This puts her in fault. In the absence of all testimony on the part of the steamship, it cannot be ascertained how far this omission on the part of the schooner contributed to her sudden appearance. Nevertheless, the positive breach of the statute puts her in the wrong. "Where a vessel has committed a positive breach of a statute, she must show not only that probably her fault did not contribute to the disaster, but that certainly it did not do so; that it could not have done so." The Pennsylvania, 19 Wall. 126, 22 L. Ed. 148. In order to recover full indemnity for a collision, the suffering vessel must be without fault. The Grace Girdler, 7 Wall. 196, 19 L. Ed. 113.

Two more points require notice. It is charged that the steamship did not stand by after the collision. She did change her course, and blew her whistles. The darkness of the night and the heavy gale separated the vessels so that she could not discover the schooner.

It was finally suggested that there was no proof that the Howard was the steamship in the collision. The Howard did certainly leave Norfolk for New York that day, and was near the place of the collision. There is no evidence whatever that any other steamship left on that day on that course for any northern port. It is admitted that the Howard was in collision with some vessel that night, which "lightly struck the steamer on her port quarter." This was precisely the place and this was the character of the blow which libelants prove.

The court below awarded the libelant, as full damages, $3,193.72, with interest and costs. Our examination leads to the conclusion that libelant, not being without fault, must bear her part. It is ordered that the decree of the district court be modified, and that the cause be remanded to that court with instructions to enter a decree for libelant in the sum of $1,596.91, with interest from April 1, 1900, and costs in this court and the court below.