## THE VIRGINIA.

### (District Court, E. D. Virginia. January 25, 1913.)

COLLISION (§ 95*)—STEAM VESSELS IN HARBOR AT NIGHT—MUTUAL FAULTS.

A collision in Elizabeth river off Norfolk & Western Railroad piers at Lambert's Point on a dark and stormy night between a tug with a heavy dredge in tow attempting to pick her way into the harbor, which was crowded with anchored shipping, and a steamer, which was attempting to pass out, *held* due to the fault of both vessels; the tug being in fault for not sooner sounding passing and danger signals, when she admitted seeing the searchlight of the steamer some time before she sounded such signals, and the steamer, being equipped with searchlights and knowing the crowded condition of the harbor, for not exercising greater vigilance in looking out for incoming vessels, and not keeping herself under better control; both also *held* in fault for not sounding fog signals under the existing conditions.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by the Lambert's Point Tow Boat Company, owner of the steam tug Triton, against the steamer Virginia. Decree dividing damages.

Hughes & Vandeventer, of Norfolk, Va., for libelant.
Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. On the evening of December 13, 1909, about 7 o'clock, the libelant's steam tug Triton, towing a dredge, came into collision with the steamship Virginia, of the Old Bay Line, resulting in damage to both vessels, but particularly to the tug, for the recovery of which the libel in this case was promptly filed, though no trial was asked until some three months since.

The collision occurred in the Elizabeth river, about abreast of the merchandise piers of the Norfolk & Western Railroad at Lambert's Point. The Triton was a large tug, 225 tons gross, 114 feet 5 inches long, 26 feet 5 inches beam, 14 feet 5 inches depth, and the dredge, furnished with engines with which to pump mud, was 140 feet long, 40 feet wide, and at the time was being towed on a hawser of 25 fathoms. The Virginia, 300 feet long and about 60 feet beam, was a large passenger steamer plying between Norfolk and Baltimore.

The circumstances attending the accident are, briefly, these: At a point about opposite the merchandise piers, a tramp steamer was anchored in midchannel, tailing across the river to within a short distance of the railroad piers on the eastern side of the channel. At the same time a schooner was anchored a short distance, some 300 feet as is claimed, down the river, to the westward side of the channel, and tailing out into the channel, leaving between the bow of the tramp ship and the stern of the schooner but a narrow fairway. The harbor was greatly congested in this locality, particularly at and below where the schooner cast anchor. It was a dark, rainy, squally night, with the wind blowing heavily, the Virginia's lookout saying, "It was raining so thick you could hardly see anything."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The tug's position is: That she was in pursuit of a safe anchorage place for her tow on the western side of the river at Lambert's Point, and with that end in view, finding many vessels at anchor, she followed as close to them as it was prudent and safe for her to go; but, observing the crowded condition, determined to proceed beyond Lambert's Point up to the mouth of the Western branch of the river. While thus proceeding, she discovered the schooner before mentioned lying further out in the stream than the rest of the vessels at anchor, she at the time bearing on the schooner about amidships. That she at once starboarded her wheel, passed under the schooner's stern some 50 feet distant therefrom, then ported, passing the bow of the anchored steamship some 300 feet to the westward, and after passing the ship, and when her dredge was about abreast of the same, the collision in question occurred. That before she reached the schooner she observed a passenger steamer, which turned out to be the Virginia, up the river, in the vicinity of Pinner's Point, playing its searchlight down the channel. That this light was played on the dredge, the schooner, and the anchored steamer, first one and then the other, and then on the tug's pilot house, mainly upon the latter, whereby its navigator was blinded, and, finding that he was getting in close quarters, he blew his danger signals, which were answered by the steamer, when the searchlight was thrown off, and the collision quickly followed. The tug's navigator testifies that he did not know, and could not tell, whether the steamer flashing lights upon him was anchored or moving, and that, when he gave the danger signals, it was not in apprehension of a collision with that vessel, but because he was afraid that the tug would foul some anchored vessel.

The Virginia's position, on the other hand, is that she was coming down the river under one bell; that on reaching the Southern Railway piers, she encountered a heavy squall from the southwest, and stopped her engines; that it was dark and rainy, the wind blowing pretty strong, and the whole river congested with anchored craft on both sides; that, when about a quarter of a mile below No. 4 pier of the Southern Railway, her engines were stopped, and from thenceforth she moved under her own momentum; that it was not safe for her to navigate to the eastern side of the channel, and, having determined to go round the bow of the anchored steamship, she was playing her searchlight in that vicinity, and especially upon the anchored vessel's stem, with a view of discovering the nearness with which she could approach, taking into account her anchor chains; that suddenly, when in about the length and a half of his vessel, the Triton abruptly emerged from behind the anchored steamship, showing her red light, and proceeded to cross the Virginia's course, having immediately theretofore sounded its danger signals, to which the Virginia answered, and put her engines full speed astern; that the presence of the tug had not theretofore been observed, nor was it known then that she had a tow, nor had the Virginia's navigators observed the presence of the schooner tailing out into the western side of the channel.

Upon the facts thus stated, it will be seen that the case turns upon whether or not the tug and tow were in fault for coming unexpectedly

from behind the anchored ship, or the Virginia for failing to observe their presence, or whether the collision came about as the result of mutual fault on the part of both, or is a case of inevitable accident arising from the then effort to pass each other under existing conditions in the narrow channelway remaining between the schooner and the anchored steamship. If the tug's view be correct, that there was a space of 300 feet left in the channel between the schooner and the anchored steamer, and that she navigated within 50 feet of the stern of the schooner, leaving 250 feet of space open immediately in front of the down coming steamer, which was viewing the lay of the waters with its searchlight, there would seem to be but little difficulty in reaching a conclusion of the case favorable to the tug. But this view the court does not think is sustained by the testimony. On the other hand, if the Virginia's contention be accepted, that while she was proceeding down the river, virtually drifting, and taking due precaution to look out for obstructions ahead, that this tug suddenly emerged from behind the anchored ship, having given no previous indication of its presence, and crossed her course when too late for her to escape collision with it, her claim of nonliability would probably be equally clear.

The court, however, is not inclined to accept in their entirety the contentions or views of either vessel, certainly to the extent of holding either of them free from blame under the circumstances. In the crowded condition of the harbor, and the prevalence of the wind, rainstorm, and darkness, necessarily some uncertainty must exist as to just what did occur. It is hard to credit the tug's statement that navigating up the channel immediately in front of the downcoming steamer, playing her searchlights upon it, the Virginia would have continued on, or that the tug would have failed to give the proper passing signals and danger signals earlier. On the contrary, it is far more probable, having regard to the harbor and weather conditions prevailing, and especially taking into account the fact that the curve or bend in the river at which downcoming vessels changed their courses for Craney Island reach was just about where the tramp ship and schooner were anchored, that the distance between the stem of one and the stern of the other, even if 300 feet off the bow of the tramp, was nothing like so much on a straight line from the schooner's stern to the ship's bow, and hence when the Triton starboarded to go round the stern of this anchored schooner, having regard to the necessity for the safe passage of its heavy tow round the schooner, that it went so far to the eastward as to come across the line of the anchored ship and under its shadow, and that while thus moving under starboard wheel, and backing under the influence of the port wheel to go to the southward, at least its bow light and running lights may have been out of the vision of the navigators of the down coming steamer, and the same may have been true of the lights of the dredge on its forward and rear ends, and that hence the collision was largely brought about as the result of this tug and tow attempting, as is claimed in the libel, to "pick its way" through a fleet of vessels at anchor in the river, and moving in front of the down coming steamer, which it also attempted to pass. Upon the tug's own showing, having seen this steamer before reaching the schooner

at anchor, and before making the maneuver to pass under its stern, it was her plain duty under the circumstances, with the then existing conditions of the channel and weather before attempting to pass round the schooner with a long and heavy tow, the stern of this schooner tailing out from one side of the channel across the bow of the ship at anchor, to have given passing signals, and to have earlier sounded danger signals. It can hardly be conceived that had danger signals been given as she approached the schooner, and before making the maneuver first to port and then to starboard to go under the stern of the schooner, and across the stem of the ship, that the collision would have occurred in as short a space of time after giving the danger signals, as it did. Having regard to the speed at which the tug was moving, there must have been some interval of time in passing round the stern of the schooner, and if the danger signals, or even the passing signal had then been sounded, no collision would probably have occurred, as the Virginia would have earlier put her engines astern, and the two vessels have never reached each other. The evidence strongly tends in the view of the court to support the contention that certainly for some space of time the view of the tug was obstructed from the Virginia by the anchored ship, and that its danger signals were not sounded until in close proximity to her. This view would seem to make the fault of the Triton clear. Whether or not it can be said that the Virginia is free from fault, and hence should not in part respond for the loss sustained, is not so clear; but, under all the circumstances of the case, the court thinks, especially having in mind the burdens borne by the unincumbered steamship, to avoid as well the risk of collision, as the collision, with the tug and tow, that she cannot be held entirely free from fault; and hence must bear her share of the loss sustained. She was fully equipped with searchlights, and every facility to safeguard her progress, and to see if she thought it prudent to navigate at all, in the then congested condition of the river, that she did so in such manner as at all times to be able to control her movements, and this she seems not to have done. She was entirely justified in not attempting to pass to the eastward of the channel, but in going to the westward, she knew of the anchorage conditions about the bow of this anchored ship, and the congestion there, and around her generally at that time; and she should, especially having regard to the usual change of course in navigation at that point, and the fact that this anchored ship extended so far across the channel, have realized that it was an extremely dangerous risk she was taking in attempting to pass between its bow and the ships at anchor, and that others might be moving up the channel if she was moving down, and hence should have used extraordinary efforts to look out for moving as well as anchored vessels, and this duty in the judgment of the court she failed to perform. It is doubtless true that the tug's lights may have been confounded with those of other shipping at anchor; but, whether this be so or not, it does seem that this tug and tow, especially before its view was obstructed by the anchored ship, if it was so obstructed, ought to have been seen by those navigating the Virginia, and certainly that the Virginia would have observed the presence of

the schooner tailing out into the channel from the westward, which also seems to have entirely escaped her. The failure to observe the running lights of the tug and tow might be accounted for under the circumstances here, but it would seem that, by proper vigilance, the Virginia could and should have observed the stem light, and certainly the cluster of lights of the tug, and the fact that she did not do so cannot be excused. It is true the omission is largely due perhaps to vigilance in watching the bow of the tramp steamer, round which she was to pass, and with a view of not fouling her anchor, and to this the Virginia seems to have devoted most of her care and caution, which, however commendable, should not excuse her from otherwise observing and looking out for obstructions in the channel, and the rights of those lawfully navigating the same. Upon this statement the Virginia cannot avail herself of the defense of inevitable accident, as her omission in part brought about the disaster; and the case is one of mutual fault of the two vessels.

This is all perhaps that is necessary to be said upon the pleadings in this case, and the issues made between the parties. There are two other considerations that should not be lost sight of, which, however, do not change the result, as the parties are equally guilty in both particulars, though they tend perhaps to relieve any doubt as to the correctness of the conclusion reached:

First. It is entirely manifest, having regard to the width of the channel, the bend therein, and the necessities of commerce at that place, that the fairway was so congested at the time of this collision that it was imprudent for two vessels of the size here to pass each other within the space left open by those monopolizing the harbor for anchorage. There was no real excuse for either the schooner or the tramp ship to have anchored as they did, and it was inexcusable for them both to have been so anchored at the time of this occurrence. The tramp ship practically monopolized one-half of the channel, at one of its most crowded and difficult points, so that steamers leaving this harbor, many of them carrying large numbers of passengers, could not pass to the eastward at all, but had to go to the westward, taking chances of collision with the shipping then and usually anchored there. This ship, at least, should not have so anchored as to have both sides of the channel obstructed. Neither of the parties litigant have, however, seen fit to bring the anchored vessels before the court in any of the methods prescribed by law.

Secondly. It is equally clear that neither the Virginia nor the tug and tow were complying with the rules of navigation governing them in the then weather conditions. These rules prescribe, not only that vessels shall go at a moderate speed, having regard to the existing circumstances and conditions, during "fog, mist, falling snow or heavy rain storms," but that a steam vessel under way during the prevalence of such weather shall sound, at intervals of not more than one minute, a prolonged blast of its whistle. No attention whatever was paid to these regulations by either vessel, though the weather was such, particularly respecting the darkness of the night and the character and crowded condition of the channel, that they should have been strictly

observed by moving vessels. The master of the tug testified that it was a rainy, dark, squally night, with the wind blowing heavy from the southward; the master of the dredge, that it was raining very thick as they passed Lambert's Point; the master of the Virginia, that an ugly squall prevailed; and that it was dark and rainy, and the wind blowing pretty strong, and the whole river congested, filled with anchored craft on both sides; and the lookout on the Virginia, that it was raining so thick you could hardly see anything.

The Circuit Court of Appeals for this circuit, in an opinion by Judge Simonton, after giving the history and several modifications of the rules in question, says the enforcement of this rule is imperative, and that failure to observe the same constitutes fault on the part of the ship neglecting to do so. Merchants' & Miners' Transp. Co. v. Hopkins, 108 Fed. 890, 894, 48 C. C. A. 128. In this case, both vessels having failed to observe this salutary rule, neither can escape responsibility for so doing, unless it manifestly appears that the omission did not, and could not have entered into the occurrence, which is in no manner apparent here, as it is quite evident that the compliance with the rule on the part of either vessel, would have prevented this collision.

It follows from what has been said that this collision occurred as the result of mutual faults of the two vessels, and a decree will be entered so determining.