### THE PAPOOSE.*

#### UNITED STATES v. PETROLEUM NAVI-GATION CO.

#### PETROLEUM NAVIGATION CO. v. UNITED STATES.

#### Nos. 352, 353.

Circuit Court of Appeals, Second Circuit.
July 13, 1936.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for Petroleum Navigation Co. and the Papoose.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

Following a collision at sea off Cape Henry, Va., in the evening of May 2, 1931, between the steamship Papoose of the Petroleum Navigation Company and the U. S. S. Wright, an airplane tender, in which both vessels were considerably damaged, the government sued the Papoose in rem. The Petroleum Navigation Company appeared as claimant and also filed a cross-libel charging the Wright with all fault which occasioned the collision. The Papoose was found grossly at fault and, though the Wright failed to sound fog signals under the circumstances about to be related and that failure was held to be a violation of the fog rule, was solely held liable for the collision. Her fault is now admitted, and this appeal is an attempt to secure a modification of the decrees to charge the Wright with half damages.

At the time of the collision the Wright, formerly a merchant vessel of 13,500 tons' displacement, 500 feet long, with a beam of 67 feet, and a draft of 24, which had been converted into an airplane tender having a complement of 80 officers and 450 men, was nearing the Virginia Capes from the southward on a voyage from Cuba to Hampton Roads. The sky was clear, and it was fairly clear along the water from the south to west and to about north. From north through east it was hazy with low lying patches of fog. Her course was set at 7:55 p. m. at 314 degrees true from Buoy 2CB to Buoy 2A, and her speed was reduced from 14 to 12 knots. Two lookouts were stationed forward and one on each wing of the bridge. The commanding officer was on the bridge with two officers, one on the port wing and one on the starboard. At 8:15 p. m. with the Junction Buoy abeam and about 1,000 yards away, the Wright changed her course to

*Writ of certiorari denied 57 S. Ct. 230, 81 L. Ed. —.

287½ degrees true on a heading for Thimble Shoals Channel. Three steady white lights were seen ahead after the Wright had settled on her new course and were reported by her lookouts. These have been identified as those of the Baltimore Pilot Boat and the range lights of a steamer bound out of Thimble Shoals Channel. At this time the flashing white light on the buoy at the entrance of Thimble Shoals Channel was seen dead ahead and about seven miles away. The Wright was now skirting a fog bank lying about 300 yards to her starboard and at 8:22 p. m. reduced her speed one-third to give her a speed of about four knots through the water after the reduction became effective. She did not, however, sound any fog signals. While she was so proceeding, a steamer suddenly broke out of the fog bank abaft her beam about 300 yards away on her starboard quarter showing her red light and bearing down on a course converging on the Wright's. This steamer was the Papoose, which almost immediately sounded an alarm, put her helm hard aport, and reversed at full speed. The Wright at once reversed full speed under a hard left rudder in an attempt to get parallel to the course of the Papoose and sounded two blasts, but the collision could not then be avoided. The ships came together while the Papoose was making about eight knots and the Wright five, the Papoose striking the Wright on her starboard bow cutting in a distance of about five feet. The ships then went apart, and after ascertaining that neither needed immediate assistance, the Wright proceeded into Hampton Roads, while the Papoose put into Norfolk.

The Papoose, a tanker 432 feet long, with a beam of 53 feet, drawing 31 feet of water, was on a voyage in ballast from Baltimore to Trinidad. On the evening of the collision she had dropped her Chesapeake Bay pilot at 8:15 p. m. about a mile and three-quarters off Cape Henry and then proceeded on a course southeast magnetic which put her on a heading of 128½ degrees true that placed the two vessels on courses intersecting at an angle of 21 degrees, with a heavy fog bank between them. About ten minutes before the collision the two white masthead lights of the Wright were seen from the Papoose a point and a half on her port bow and about three miles away, but as no side lights were visible it was erroneously assumed that the two white lights indicated a vessel at anchor and no attempt was

made to determine by taking accurate bearings whether this assumption was right or wrong. Instead, the Papoose ported her helm in about five minutes after seeing the lights of the Wright supposed to be those of an anchored vessel and kept right on in the unjustified belief that she would pass that vessel safely until she emerged from the fog as already stated. She sounded no fog signals whatever.

As the fault of the Papoose is obvious and conceded, no time need be taken in discussing that. The Wright's fault, if any, is alone now of consequence. She is charged with having too many lookouts, presumably on the theory that all failed in the belief that another would report. But the evidence does not bear out that contention and it may be laid aside without more.

■ The serious matter is the failure of the Wright to sound fog signals. Though she was not actually in the fog, she was running along a heavy bank but 300 yards distant out of which a ship might emerge at any time, as the Papoose in fact did. Both the Inland Rules, art. 15 (33 U.S.C.A. § 191), and the International Rules, art. 15 (33 U.S.C.A. § 91), provide that ships must sound signals as described "In fog, mist, falling snow, or heavy rainstorms, whether by day or night." Compliance requires the sounding of the signals by a vessel not only when she is herself in the fog, but is so close to it that her position should be made known to a vessel which the fog might be hiding. The William H. Taylor, 278 F. 717 (C.C.A.2); The Perkiomen, 27 F. 573 (D.C.). In view of these decisions the argument here made that there was no positive breach of the statute cannot be treated as sound.

The trial judge was fully aware of the fault of the Wright in this respect, but being of the opinion that, as the Papoose had already seen the Wright's masthead lights she had had sufficient warning of the presence of the vessel and so failure to sound fog signals, though a fault, did not contribute to a collision for which the exceedingly negligent navigation of the Papoose was shown to have been ample cause. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943. We would agree were it not necessary to treat a statutory fault with greater severity.

■ The established rule is that the Wright was bound to show, if she would be exonerated, not only that her positive breach

of the statute in failing to sound fog signals did not probably contribute to cause the collision, but that it could not have contributed. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218; Steamship Martello v. Willey, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637; Merchants & Miners' Transportation Co. v. Hopkins (C. C.A.) 108 F. 890. Though the Papoose was so negligently navigated that the white masthead lights of the moving Wright were thought to be those of an anchored vessel for a period so long that the error was wholly without justification, no one can say with assurance that had the Wright sounded the required fog signals the Papoose would still have remained ignorant of the fact that she was approaching a moving vessel when sound as well as sight, if properly used, indicated the contrary. So the Wright failed to prove that her fault could not have contributed to cause the collision.

Decrees modified to hold both at fault and divide the damages.