## THE NORTH POINT

(District Court, E. D. Virginia. May 9, 1913.)

1. COLLISION (§ 100*)—STEAM VESSELS MEETING IN FOG—PASSING SIGNALS.

    A collision in Elizabeth river in a dense fog bank between the British steamer North Point, coming in from Hampton Roads, and the steamer Pennsylvania, passing out, *held* due solely to the fault of the North Point for proceeding at excessive speed in the fog, knowing of the proximity of another vessel, but chiefly because her pilot sounded passing signals in violation of article 18, rule 9, of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2882]), which expressly prohibits the giving of passing signals except when steamers

are in sight of each other, and provides that in fog only fog signals shall be given.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec. Dig. § 100.*]

2. COLLISION (§ 123*)—SUIT FOR DAMAGES—CONTRIBUTORY FAULT—BURDEN OF PROOF.

A vessel whose violation of the rules was sufficient to account for collision cannot escape liability by casting doubt on the navigation of the other vessel, but in order to hold her liable in whole or in part must clearly prove her negligence.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 259–261; Dec. Dig. § 123.*]

In Admiralty. Suit for collision by the New York, Philadelphia & Norfolk Railroad Company against the steamship North Point, with cross-libel. Decree for libelant.

Thomas H. Willcox and Hughes & Vandeventer, all of Norfolk, Va., for libelant.

Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. This case involves the right to recover for damages sustained in a collision which occurred on the morning of January 2, 1913, about 8:35 o'clock, in the waters of the Elizabeth river, Va., some 300 yards above or to the southward of Boush Bluff Lightship, between the British steamship North Point, en route from Newport News to Norfolk, and the New York, Philadelphia & Norfolk Railroad Company's steamer Pennsylvania, en route on her daily outward trip from Norfolk to Cape Charles. The North Point is a large ocean-going freight steamer, known as a "tramp," of 5,216 tons gross burden, 390 feet long, 51 feet beam, 27.7 feet deep, and at the time of the accident about two-thirds loaded; and the Pennsylvania is a fast passenger steamer of 1,352 tons gross burden, 244.3 feet long, 40 feet beam, 14.8 feet deep. Both vessels were proceeding in a dense fog bank, which set in only a short time before the vessels collided, and lifted soon thereafter.

The contentions of the parties, respectively, as shown by the pleadings, are briefly, on the part of the North Point: That on the morning in question, while in charge of a duly licensed Virginia pilot, who was on the bridge in active charge of the navigation, as she was proceeding along the Elizabeth river, she observed a bank of fog up the river, towards Lambert's Point, apparently slowly drifting down the channel. That she proceeded on her proper course, and when getting in the vicinity of the fog bank her fog signal was blown at regular intervals, her engines slowed, and shortly after entering the edge of the fog bank were stopped, and so continued until just about the moment of the collision. That as the fog bank was approached, signals of a tug and tow, and of one or perhaps more vessels, were heard in the fog ahead, and the tug and tow were thereafter passed starboard to starboard, close aboard. That upon stopping her engines the pilot began blowing fog signals at regular intervals, indicating that his engines were stopped, and shortly thereafter

a similar signal was heard from a steamship, which proved to be the Pennsylvania, ahead and slightly on the port bow. These signals were repeated by the North Point several times, and similar signals heard from the Pennsylvania, which appeared to be approaching on the port hand, until suddenly the last-named vessel appeared coming through the fog head on, at a rapid rate of speed, a very short distance away, and continued to approach rapidly, striking the North Point bows on, on the latter's port bow, inflicting serious injury to the North Point. That, after colliding, the Pennsylvania passed along the port side of the North Point, her port quarter coming in contact with the port side of the North Point aft of amidships, and proceeded some distance astern before coming to a stop. That at the time of the collision the North Point was, and for some time prior thereto had been, on a compass course of south by west; and was practically still in the water; the tide being ebb. That as soon as the Pennsylvania was discovered approaching the North Point, the latter's engines were ordered full speed astern; but the vessels were so close together, and the Pennsylvania proceeding at such a rapid rate of speed, as that the North Point had not time to get in backward motion before the collision. That the collision was not due to any fault or negligence on the part of the North Point, or her crew, but was brought about by the fault, negligence, and want of skill on the part of the Pennsylvania and her navigators, and especially in that the Pennsylvania was not going at a moderate rate of speed in the weather then prevailing; that she was not proceeding down that part of the channel which lay on her own starboard side of midchannel; that when hearing the fog signal of a vessel ahead, or nearly ahead, she did not stop, and then navigate with caution, until danger of collision was over; that she was sounding unlawful and prohibited signals in the conditions then prevailing; that on approaching the North Point she did not slacken her speed, stop, or reverse, or take other necessary and proper measures to avoid collision; and that she was not properly manned, and failed to have an efficient and diligent lookout.

And, on the part of the Pennsylvania: That on the morning in question, at 8 o'clock, she left Norfolk bound for Cape Charles, on an ebb tide, and upon reaching Pinner's Point fog was encountered. That proper signals were given, her engines stopped, and the steamer proceeded very cautiously until the piers at Lambert's Point were reached, when the fog lifted and continued so until she reached Craney Island, when fog was again encountered, and continued from thence to the collision. That she was then navigating on the east side of the channel, blowing the regular thick weather signals, and proceeding at a speed barely sufficient for steerage way. That before reaching Boush's Bluff Lightship a fog whistle of a tug and tow was heard, whereupon she stopped her engines, and remained stopped for upwards of two minutes. That then the fog whistle of an approaching steamer was heard, seemingly ahead, when the Pennsylvania blew three whistles and backed her starboard engine, her engines having been stopped for upwards of two minutes, and her speed being very little. That thereafter a signal of two whistles was heard from the

approaching steamer, which proved to be the North Point, when the Pennsylvania gave another signal of three whistles; her engines continuing full speed astern. That the North Point immediately blew two blasts, and again the Pennsylvania sounded three blasts; she still continuing full speed astern. That at that time the North Point was observed looming up in the fog ahead 30 or 40 yards distant, and seemingly moving slightly to the westward and approaching rapidly. That the Pennsylvania was in backward motion at that time, and the North Point approached rapidly, and came into collision with the Pennsylvania, the bluff of her bow on the port side, about 35 feet from the stem, striking the stem of the Pennsylvania. That the collision occurred to the southward of Boush's Bluff Lightship, and on the eastern side of the main ship channel. That the collision was caused by the North Point not going at a moderate speed. That she was proceeding up the wrong side of the channel. That she was not sounding lawful thick weather signals. That she was sounding unlawful and prohibited signals. That she did not slacken her speed, stop, or reverse, and take other necessary and proper steps to avoid the collision. That she did not have a proper and efficient lookout properly stationed and diligently attending to his duties, and that she was not being navigated by an efficient and competent navigator.

[1] It will be observed that each vessel assigned various acts of negligence and fault one against the other, many of which, in the estimation of the court, it will be unnecessary to determine, though all have been fully considered. Inasmuch as the case turns almost entirely upon the speed at which the vessels were proceeding, at and about the time of the collision, and the manner of the observance by them respectively of the rules of navigation properly applicable, governing their movements under the circumstances in which they were placed at the time of the accident, these two causes will be considered in the order named.

First. It being a concessum in this case that, because of the density of the fog, the vessels did not actually observe each other until they were some 100 feet apart, the speed at which they were going necessarily is a matter of considerable moment in the case, and if it could be certainly ascertained would aid materially in solving the case. The conflict in the testimony in this respect is irreconcilable; the evidence of each vessel being to the effect that the other was at the moment of collision proceeding at the rate of six or seven knots an hour, while she herself was practically at a standstill in the water. That one or other version is incorrect is manifest, for the reason that, if both vessels were at rest, there would have been no collision; and while it is difficult to tell just at what speed they were actually proceeding, it is quite clear that neither was going at the speed alleged, or the effect of the collision, as shown by the character of the injury on the respective vessels, would have been more disastrous than it was.

The preponderance of the testimony, in the view taken by the court, tends to show that each vessel at the time of the collision was moving forward somewhat, the North Point more rapidly than the Pennsylvania, and at a rate of speed greater than was permitted by the rules

of navigation in a fog, which fact may have caused the accident, and be sufficient to condemn the North Point, though the court does not believe that was the actual cause of the collision, but that the same was the result of the latter vessel's violation of the appropriate rules and regulations governing her movements, immediately prior to and at the time of the collision.

Second. The two vessels shortly before the collision, one ascending and the other descending the river, encountered a dense fog bank, the ascending vesel entering the same somewhat later than the other; each having observed the fog signals of a tug and tow proceeding down the west side of the channel. They thereupon, as well on account of the tug and tow as of each other, gave the regulation fog signals; that is, one prolonged blast of their whistles, at intervals of not more than one minute.

"Art. 15. (a) A steam vessel under way shall sound, at intervals of not more than one minute, a prolonged blast."

Both vessels claimed that they had stopped their engines, and had slowed down to mere steerage way:

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rain-storms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over"

—and were so navigating shortly before the collision in the fog, when suddenly the North Point sounded two blasts of her whistle, a signal which ordinarily would indicate her purpose of passing the Pennsylvania starboard to starboard, but which signal had no place during the existence of fog, as the rules of navigation in terms prescribe that during such weather passing signals shall not be given, and that fog signals only must be given.

"Art. 18, rule 9. The whistle signals provided in the rules under this article, for steam vessels meeting, passing or overtaking, are never to be used except when steamers are in sight of each other, and the course and position of each can be determined in the day time by a sight of the vessel itself, or by night by seeing its signal lights. In fog, mist, falling snow or heavy rainstorms, when vessels can not so see each other, fog signals only must be given."

The Pennsylvania, upon receiving the two signals from the North Point, at once reversed, putting her starboard engine astern, and gave the proper signal of three short blasts on her whistle indicating that fact. Whereupon, the North Point continuing to give the two signals, the Pennsylvania again sounded three blasts, put her port engine astern, and her wheel to port, and the collision shortly thereafter occurred.

The testimony of the witnesses for the Pennsylvania was positive that she gave three whistles after the North Point gave two, and while some of the witnesses for the North Point insist that the Pennsylvania answered with two blasts on her whistle, the pilot in charge of her navigation admits that he heard the three blasts on the whistle from the Pennsylvania. The North Point admits having given the two blasts

after first sounding her fog signal, as contended for by the Pennsylvania; the pilot's excuse for so doing being that he had confounded the International with the Inland Rules of Navigation. The International Rules are as follows:

"Art. 15. (a) A steam vessel having way upon her shall sound, at intervals of not more than two minutes, a prolonged blast.

"(b) A steam vessel under way, but stopped, and having no way upon her, shall sound, at intervals of not more than two minutes, two prolonged blasts, with an interval of about one second between."

These latter rules, as distinguished from the Inland Rules, which apply to the waters in which this accident occurred, provide that fog signals are to be sounded at intervals of not more than two minutes, instead of one minute, as required by the Inland Rules; and while by paragraph (b) of article 15 of the International Rules it is prescribed that two prolonged blasts of the whistle shall be given, instead of one, this regulation applies to vessels that have stopped, and have no headway upon them, which was clearly not the case here, as the North Point was manifestly under way at the time of the collision, and making sufficient speed to have brought about the same, as indicated above.

The North Point at the time was in charge of and being navigated by a regularly licensed state pilot, charged with knowledge of the rules of navigation properly applicable to the ship's movements, namely, the Inland Rules; and he admits that he did not follow such rules, but, on the contrary, was navigating, as he supposed, under International Rules, and as a matter of fact misunderstood the latter rules, which error on his part undoubtedly brought about the collision. The Pennsylvania at the time of the collision seems to have been observing the rules governing moving vessels in fog. She was moving at a moderate speed, having careful regard to existing conditions and circumstances, and, hearing the fog signal ahead of her from a vessel whose position had not been ascertained, stopped her engines, and then navigated with caution, which was all she was required to do; and she, moreover, upon hearing the signal of two blasts of her whistle from the North Point, reversed her engines, putting the same full speed astern, and gave appropriate signals indicating such reversal.

[2] This, in the judgment of the court, was all that could have been demanded of the Pennsylvania; and the action of the North Point, in thus navigating in a fog in plain violation of the rules, is sufficient to and does account for the happening of the occurrence; and hence she cannot escape responsibility for her negligent acts by attempting to place doubt upon the conduct of those navigating the Pennsylvania. The burden would be clearly upon the North Point to establish such negligence, and that it brought about the disaster, in order to hold the Pennsylvania liable in whole or in part for the collision, which burden she has plainly failed to meet. The Victory & Plymothian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; and cases cited; The Eagle Wing (D. C.) 135 Fed. 826, 832, 833; Baltimore Steam Packet Co. v. Coastwise Transportation Co. (D. C.) 139 Fed. 777, 779.

The duty imposed upon navigators of complying strictly with the rules prescribed for their guidance is imperative, and in cases of fog

a strict adherence to the requirements is the only method whereby vessels can safely move at all; and what is said in this regard is particularly applicable to licensed pilots, the necessity for whose intelligent and faithful discharge of duty cannot be too strongly emphasized, since they are officials placed by law in charge and control of the property of others, without the owners' consent, and the property is liable for the consequences of their negligent acts of omission and commission.

Counsel for the North Point suggest that the Pennsylvania erred in not putting her wheel to port upon reversing, and putting her port engine astern, and that as a matter of fact, at that time, looking to the circumstances of this accident, she should have starboarded instead of ported. The court is by no means prepared to admit the correctness of this position. While it is perhaps true that, if the North Point had purposed to pass starboard to starboard, which was not the case, the maneuver might have been debatable, as the throwing of the Pennsylvania's bow to port instead of to starboard would have perhaps been less dangerous; but in the manner in which the vessels came together—that is to say, the stem of the Pennsylvania striking the port bow of the North Point—certainly it did not tend to increase the damage caused by the actual collision, whereas the contrary movement might have thrown the Pennsylvania across the course of the North Point, and resulted in her being cut in two. Doubtless a mistake in this respect would, in any event, have been but an error in extremis.

It follows from what has been said that, the collision having been brought about solely because of the negligence of the North Point's navigator, a decree will be entered so ascertaining, and dismissing the cross-libel filed by the North Point against the Pennsylvania.