## THE SILVER PALM.

### THE CHICAGO.

### SILVER LINE, Limited, v. UNITED STATES et al.
### No. 8146.

Circuit Court of Appeals, Ninth Circuit.
Oct. 28, 1937.
Rehearing Denied Jan. 31, 1938.

Lillick, Olson, Levy & Geary, Ira S. Lillick, and Joseph J. Geary, all of San Francisco, Cal., for appellants.

H. H. McPike, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellees.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by the owner of the British motorship Silver Palm against the United States, the owner of the naval cruiser Chicago, and other libelants suffering injury or seeking recovery for wrongful death resulting from a collision in fog conditions between the Chicago and the Silver Palm, in a three-vessel maneuver in the coastal traffic lane pursued in the fog by merchant ships between San Francisco and San Pedro. The collision occurred on October 24, 1933, at or about 8:07 o'clock in the morning.

We accept the testimony (Tr. 125) of the Senior Admiral on board the Chicago that, from shortly before 8 o'clock until the collision, the Chicago was steaming along the "edge" of a fog "patch" on her left. Whatever the density of the so-called fog patch was at 8 o'clock, at 8:05, shortly before the collision, it had become "thick" (Tr. 1295), and the Admiral says the Silver Palm emerged from it clear cut to the eye as to her bow, but indistinct as to her stern, still in the bank (Tr. 114).

The cruiser, on a northerly course, 350 degrees true, sought, by turning to her left, to avoid a merchant ship, the Albion Star, bound for San Francisco, emerging on a northerly but converging course from a fog bank on her right. In this maneuver she met and collided with another merchant ship, the Silver Palm, bound for San Pedro, suddenly emerging from an opposite fog bank along the "edge" of which the Chi-

cago had been steaming for at least 8 or 9 minutes. Three of the Chicago's officers were killed.

The appeal concerns the responsibility for the collision, the amount of damages to be awarded not having been considered. The Silver Palm, emerging from the fog at a speed estimated by the cruiser's captain at 10 knots (Ap. 165, 255, 256), does not question her causative fault. The sole question here is the validity of the Silver Palm's claim of fault on the part of the cruiser Chicago, in proceeding between the two fog banks at so much in excess of the moderate speed required by article 16 of the International Rules (33 U.S.C.A. § 92), that on sighting the Silver Palm emerging from the fog bank ahead on her port and being blown across her course, she could not have stopped dead in the water in the Chicago's share of the distance between the two vessels.

The District Court found the visibility between the two vessels when the Silver Palm was sighted at 1,000 yards, that the Chicago was stopped or almost stopped before the collision, and had then proceeded less than 300 yards of the 1,000 yards of visibility. Certain of the theoretical opinions of the cruiser's officers tend to support this finding of her stopping power. There is some evidence to support the finding of visibility.

At the threshold of the case arises the question of the strength of the presumption of these findings of the lower court. Although the record is a long one, some 1,727 pages, the trial court has not favored us with the opinion customarily given in admiralty cases. This is particularly desirable in a case involving complicated maneuvers, as here, of the three vessels, logs with condemning orders omitted and entries for the period of the maneuvers so altered as to make permissible a claim of purpose, the presenting to the court of a "measuring rod" test run based upon engine maneuvers favoringly different from those of the Chicago, and heavy conflict in the evidence both between the witnesses heard by the court and between some of them and the larger unheard number through deposition.

An admiralty appeal is a trial de novo, in which the Supreme Court has reversed on the fact against the findings of two lower courts. The Ariadne, 13 Wall. 475, 479, 20 L.Ed. 542; Langnes v. Green, 282 U.S. 531, 537, 51 S.Ct. 243, 245, 75 L. Ed. 520. There is a presumption in favor of the findings below varying, with other factors, with the number of witnesses to the event in issue testifying on deposition or before the trial judge, the probative importance of logs and other documents, photographs and physical exhibits of evidentiary value, equal in the appellate and in the trial court, etc. The Ernest H. Meyer (C.C.A.9) 84 F.(2d) 496, 501.

The Silver Palm contends that the findings should have but slight, if any, weight in view of the facts (1) that all three of the witnesses making the only contemporaneous entries showing her speed, the paramount question in the case, as well as a lookout and four other eyewitnesses from the Chicago, and the disinterested witnesses of the third vessel, the Albion Star, testified by deposition and were not heard by the court below; (2) that the logs of the Chicago, of the greatest importance in a collision case, contradict in important matters the viva voce testimony of certain of the Chicago's officers; (3) that the logs were altered in their statement of the acts of the Chicago and her officers in the crucial moments leading to the collision, and the alterations unexplained, creating presumptions adverse to her; (4) and the inexcused failure to produce another witness on watch in the engine room, directly in control of one of the engines producing the speed of the Chicago as she approached the two merchant ships, and who made entries, now altered, upon which that speed was calculated, one of the two questions upon which the decision depends.

It is further urged that (5) the lower court failed to consider the reckless disregard by the Chicago's commander and his squadron of four cruisers of human life and property in the heavily traveled steamship lane off the California coast between San Francisco and San Pedro, the port of Los Angeles; (6) the Chicago's continued violation of the rules of navigation, right into the jaws of the collision, including (7) an almost incredibly wrongful use of signals to an opposing vessel in the fog, given by the cruiser's captain, and understood and interpreted by the crew and by the two Admirals on the Chicago as conveying to the opposing vessel a meaning entirely contrary to the International Rules.

Finally (8) it is charged that a test run to determine the stopping distance of the Chicago when the Silver Palm was sighted, based upon engine movements entirely different from her engine room logs, and un-

truthfully more favorable to the Chicago, was offered to the court as the "measuring rod" for the court's determination of this controlling issue of fact in the case.

These are serious charges to be made against a United States naval vessel and its personnel. However, since we are agreed that, in evaluating the conduct of those in charge of the navigation of a vessel accused of fault, the state of mind in which they enter into and conduct a maneuver resulting in the loss of life and heavy damage here incurred may be vitally material, the charges of appellants and what we find incontrovertible in the evidence must receive our analysis and determination. If the claimed navigational animus exist, for hours before and continuing up to the fatal maneuvers of the three vessels, and then, in the midst of these maneuvers, a reckless disregard by the Chicago of the merchant vessels she was certain to meet, the testimony of those seeking to exculpate her from responsibility for the death of three fellow officers and the $365,000 damage to the Chicago is certainly subject to inferences of exculpating motive.

**A. The Chicago, from midnight until sighting the Silver Palm at 8.05 a. m., was proceeding in the traffic lane between San Pedro and San Francisco as a reckless menace to merchant shipping.**

**During all of these 8 hours she was violating one or another of the International Rules, culminating in the execution of orders up to 2 minutes before the collision, to reach an 18-knot speed when steaming on the "edge" of the left fog bank.**

The following is clearly established by the undisputed evidence offered by the Chicago. The Chicago was the leading vessel in a column of four cruisers steaming from the harbor of San Pedro to the harbor of San Francisco. The Vice Admiral, commanding the column from the Chicago, testifies in detail as to how they proceeded. The deck log of the Chicago shows that from midnight to 7 o'clock in the morning prior to the collision, the visibility was the lowest recorded under the naval system. For each hour it shows the visibility at zero; that is, a visibility of less than 50 yards. This figure, as explained by the table printed in the logbook, means: "0. Prominent objects not visible at 50 yards." (Resp.Ex.No. 24.) The speed then maintained by the cruisers, the Vice Admiral testifies and the log shows, was over 12 knots through the water.

The fog was so dense that, as the Admiral testifies, the distances between the succeeding and the preceding invisible members of the squadron had to be maintained by observing a spar towed by the vessel ahead which throws up a spray in the water. (Ap. 127). An experiment with a sister ship of the Chicago, conducted by the Navy a few days before the trial below, shows that at a 12 knot speed, even if promptly exerting the use in reversing of all the steam of her two boilers, capable of sending her ahead at 18 knots, the Chicago cannot be brought to a standstill until she has proceeded at least 475 yards through the water.

One of the very long-established principles of law in maritime navigation is that a vessel shall not proceed in a fog at a speed at which she cannot be stopped dead in the water in one-half the visibility before her. The Chattahooche, 173 U.S. 540, 548, 19 S. Ct. 491, 43 L.Ed. 801; The Umbria, 166 U. S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053; The Lepanto (D.C.) 21 F. 651, 659; The Old Colony (D.C.) 52 F.(2d) 992, 993; The Ernest H. Meyer (C.C.A.9) 84 F.(2d) 496, 497.

This principle would require them to proceed at a speed enabling the Chicago at least to stop in 25 yards—75 feet.

Here, this entire group of vessels, with the Chicago leading, was proceeding in the lane of heavy traffic of merchant vessels at many times their legal speed and hence above the limit of their stopping distance —the Chicago at 19 times that limit. This would be gross recklessness for a single vessel, but, when we consider the movement of the four vessels towards an oncoming opposing vessel in the fog, its recklessness is greatly heightened.

Probably the most imperative mandate of the International Rules is contained in article 16, requiring a vessel to stop her engines at once upon hearing a vessel in the fog forward of her beam.

"Article 16. Speed in fog, etc. * * *

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over." 33 U.S.C.A. § 92. Lie v. San Francisco & P. S. S. Co. (The Beaver), 243 U.S. 291, 296, 37 S.Ct. 270, 61 L.Ed. 726.

These four cruisers were but a distance of 600 yards apart. It has long been established concerning the course of sound in the fog that the whistle of an opposing vessel coming from ahead may be heard by the leading cruiser and not heard by the one astern of her. La Boyteaux, Rules of the Road at Sea, 1920, 70. The Beaver, supra. If the Chicago heard such a whistle, obeyed article 16, and stopped her engines and waited for the period in which she ascertained the position of the opposing passenger ship or freighter, she would rapidly drop her speed and be in danger of collision with the cruiser astern. Such danger would have to be avoided by the vessels following in the column by changing their courses in the fog, a dangerous maneuver on hearing the whistle of an invisible vessel ahead, which in this case would spread wider the areas covered by the four vessels proceeding at a speed so greatly in excess of the legal limit. Knowing of this danger, it is obvious the tendency would be to violate article 16 and not stop engines.

In the case of the Chicago this was more than a tendency, because she admits in her libel, and it is proved beyond controversy, that when steaming alone at 18 knots she so violated article 16 later in the morning, when she heard forward of her beam the whistle of the Albion Star and did not stop her engines for a very considerable period of time.

What might well happen to a passenger ship or freighter approaching the quadruple menace of the four war vessels, with their 475 yards stopping distance, shocks the imagination.

It further appears that the Chicago, with her four projecting propellers, was so constructed that *she could not be steered at a speed of less than 4 knots.* The Senior Admiral's testimony is: "For the steerage way on these ships, if it gets below four knots, you can not practically control them. They must be going through the water at about four knots or more before they answer the helm." (Ap. 105.)

Four knots speed is 405 feet per minutes. Granting the utmost dispatch in the use of the four throttles on her four turbines in cutting off the steam in the forward steam chambers and turning its gradually increasing power into the reverse chambers, at first stopping the shafts' forward revolutions, and then reversing them, it is inconceivable that the Chicago (with her fine hull lines to attain her 32 knot full speed) could be brought from 4 knots speed to a stop in a distance of 75 feet if a vessel should loom ahead in the 150 feet visibility shown by the six hourly entries in her deck log.

█ Vessels in a fog so dense that they must proceed at less than their steerage way are required to stop from time to time to maintain proper speed. The Eagle Point, supra. It is doubtful if this is possible in column formation, even if the Admiral had desired to obey the International Rules.

Since the Chicago could begin to be steered only at four knots, and since she would not have steerage way if she proceeded on that darkest morning according to the requirements of the law of prudent navigation, nothing but sheer reckless disregard for the rules and for the merchant fleet kept her in the lane of traffic instead of turning westerly to the less frequented waters.

Justifying these comments that cruisers having steerage way so much higher than their allowable speed had no right *at all* to be on the route they pursued as not mere trivia, are the holdings of Lord Alverstone, the Master of the Rolls, and Lord Justice Romer in the Compania (Br.Ct. of Appeal) 9 Asp.Mar.Cas.(N.S.) 177, 179, and in The Irriwaddi, Marsden Collisions, (8th Ed.) 354.

All this occurred in peace time, when the merchant vessels in this traffic lane had no reason to suppose the Navy would be engaged in such a maneuver; nor was there any pressing need to make such time between San Pedro and San Francisco in this traffic lane. If it desired to practice the vessels in keeping in column formation in a zero visibility fog, the Navy could well have afforded the extra steam to conduct the voyage maneuver 100 miles further out at sea, away from the fog traffic lanes, where the danger would be minimized.

The log shows zero visibility continued until at least 7 a. m. At 7:26 the Admiral in command of the vessels testifies that the fog had lightened somewhat and that he turned the command of the cruiser over to her captain and authorized him to increase speed to 18 knots if he thought the visibility sufficient, and detach the Chicago from the following cruisers. This is in excess of the cruising speed limit of 12 knots placed by

the Department on such voyages. The reason given by the Admiral is that it was to enable the engine room force to give a test to certain plastic furnace lining, called "hydrecon," which had been put in place in the boilers during the foggy night before. This required a four-hour test of the boilers in question at 18 knots speed or more.

Capt. Kays, instead of turning west and away from the traffic lane for his four-hour test, turned 25 degrees more to the easterly and further into the traffic lane, and by 7:45 had developed a speed of 18 knots. Here continued the reckless spirit which had prevailed throughout the night. That this spirit continued to dominate the cruiser until the collision is apparent from the fact that, after her speed was reduced when a first vessel emerged from the fog in the traffic lane, her engines were again ordered at 18 knots, although she was still running along the edge of a fog bank which the wind was blowing across her course, and in which was contained her fatal adversary.

The menace of the cruiser to merchant shipping was not confined to this recklessness as to speed in the fog. If we are to judge by their conduct and the statements of belief of the two Admirals, the Chicago's captain, and the seamen under them, the Navy has and uses fog signals entirely different from those of the merchant marine and in violation of the International Rules.

This is shown by their use of the two-blast whistle signal. Article 15 (b) of the International Rules requires from a vessel in a fog, which is dead in the water and not moored or anchored, two prolonged blasts of her whistle to indicate her immobility. The rule reads: Article 15 (b): "A steam vessel under way, but stopped, and having no way upon her, shall sound, at intervals of not more than two minutes, two prolonged blasts, with an interval of about one second between." 33 U.S.C.A. § 91.

The importance of this rule is shown by the fact that the violation of the rule imposes the severest burden of proof on the violator. He must prove not merely that probably the fault did not contribute to the collision, but that it could not have done so. The Ansaldo Savoia (D.C.) 276 F. 719, 722; The Old Colony (D.C.) 52 F.(2d) 992, 996; The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; The North Point (D.C.) 205 F. 958, 962.

When the Chicago, proceeding at 18 knots between the two fog banks, heard the fog whistle of the Albion Star forward of her beam, she immediately committed two violations of the International Rules. First, she did not stop her engines, as commanded by article 16, but, instead, put them at 12 knots speed, a fault later considered. While proceeding with the 18-knot starting momentum under the two-thirds order with 12 knots speed on her engines, she blew two blasts of her whistle to the invisible Albion Star, thus deceitfully indicating to the merchant ship that she was dead in the water.

The experiment later made with the sister cruiser, the Louisville, shows her headway never dropped below 6.8 knots. While with at least this way on her, she again blew a two-blast signal to the invisible Albion Star.

Were this all the evidence, we could pass this violation of the rules with the comment that it was but another fault of the Chicago on that eventful morning. But we cannot do this, for the Silver Palm claims that the two Admirals contend it was a proper signal required by the rules to indicate merely that the vessel had stopped her engines, though the International Rules contain no such provision and allow this signal only when the vessel is dead in the water. The captain giving the signal must have believed it meant the engines were stopped, and the quartermaster and the signal man, both then on the bridge, so interpreted it.

The testimony of many witnesses that the two-blast signal was blown just as the engines at 18 knots speed were stopped (including Navigating Officer Gray, Book of Ex., 65) establishes the belief of the captain that this was the proper order from a naval vessel. The testimony of the two Admirals, the quartermaster, and the signal man shows a use of the two-blast signal to indicate stopped engines while proceeding through the water and the signaling vessel's changing position with reference to other vessels. This testimony is given in the footnote.[1] This is in violation of International

---

[1] Other testimony of all the following witnesses shows they knew the two two-blast signals were blown when the vessel had from 18 knots to over 6 knots speed in the water.

Quartermaster Ladd: "At 8.01 we sig-

Rules, art. 15 (b), which does not concern engine orders, but, on the contrary, the vessel's immobility in the water. The two blasts are required of a steamer even if she had been dropped by a tug and had never had any engines moving to be stopped.

The proctor for the Chicago endeavors to ease appellants' criticism of this testimony by suggesting that the two-blast whistles were intended as passing signals to the Albion Star under article 28 of the International Rules (33 U.S.C.A. § 113) providing for "Two short blasts to mean, 'I am directing my course to port.'" However, article 28 permits passing signals only "When vessels are in sight of one another." The excuse requires the admission of the violation of another rule but, if it did not, it is not available. Both Admirals, the captain, and the quartermaster knew the two whistle signals were given before the Albion Star was seen, and three of them testify the signal advised of the stopping of engines and not the changing of her course.

nified stop, [from 18 knots speed] then 8.03 we were sounding at regular intervals, six seconds every minute, one whistle indicating going ahead; the same applies to 8.04; at 8.05 we stopped all engines and signified stop and emergency full speed astern, three blasts, and started blowing the siren. * * *

"A. Going ahead they were sounding one blast at intervals of six seconds every minute, indicating going ahead, and **when we stopped we sounded two blasts,** then emergency full speed astern three blasts, and sounding of the siren." (Boldface supplied.)

Vice-Admiral: "I left the bridge, having released the Chicago, about 7.15 and went to my cabin for breakfast. I had eaten my breakfast and was sitting there reading the morning news sheet when I noticed that the Chicago which had been sounding one blast on its fog whistle started **sounding two blasts on the fog whistle, which indicated that the engines were stopped.** I arose from the table, not in any hurry, went over to the door on the port side of my cabin that looked out on the water and noticed the fog was not very thick on that side, although some fog was visible.

"The Court: That was on the port side? A. The port side, and I looked at the water, and I could see that the Chicago was **slowing down materially as it went through the water.** I stood there thinking about this especially and about that time I heard the Chicago sound **two blasts again** on its fog whistle and I thought I would just go up on the bridge to see what was going on. I walked leisurely into my stateroom, which is just forward of the cabin, got my cap, walked back through the main cabin and the passageway up to a hatch, went up two decks to the flag bridge, which is the admiral's bridge, and the place from which the admiral controls the ship; the bridge is directly under the navigating bridge. Reaching the flag bridge, I at once went over to the starboard side of that bridge. As I stood on the starboard side I looked down into the water and I could see that the Chicago was then going very slowly. I thought at that time she was making between four and five knots. * * *

"I stood there listening and looking and an enlisted man who was on lookout at that part of the deck said to me 'Admiral, the steamer we heard it right over there,' and he pointed to this fog patch and I stood there listening very intently and I heard the steamer whistle. After I heard the steamer whistle, shortly after, the Chicago sounded one blast on its fog whistle which indicated that it was then going ahead, and I noticed as I stood there and watched the Chicago's head started turning slowly to port. I could gauge that by the horizon ahead and by the change of this fog bank. Just at that time I heard that whistle from the fog bank a second time, **and just then there emerged from the fog bank, at the point nearest to us along the forward edge of the bank, and further** away, a steamer." (Boldface supplied.) (Ap. 103, 104, 106, 107).

The Rear Admiral (at the breakfast table with the Vice-Admiral) gives the fog signal for stopping engines when the steamer is still proceeding through the water in the fog:

"Q. What I want to know is, an estimate of your idea of time between the time you heard this two-blast signal, **when you were still at the breakfast table,** and the time you heard a one-blast signal. **By the way, what did a two-blast signal indicate? A. Two blasts indicates that the ENGINES are stopped. ,**

"Q. And a one-blast signal indicates what? A. **That the engines are going ahead.**" (Boldface supplied.) (Ap. 309).

The signal man, like the Admirals, Captain and Quartermaster, interpreted the signal given just as the engines were stopped and the vessel going ahead with her initial knot momentum, as

"Two blasts under way, but not under power." (Ap. 1171.)

■ That the Navy is not free to navigate without regard to the International Rules in the presence of opposing merchant ships has been repeatedly adjudicated in courts of admiralty. Judge Learned Hand's opinion in a libel in the Second Circuit, in which this naval right was urged, condemns its assertion: "The International Rules * * * apply to 'all public and private vessels of the United States.' * * * If unfortunately it is impossible to equip submarines properly, they must take their chances until some provision has been made for them by law. We have no power to dispense with the statute, nor indeed has the Navy. *As they now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates.* We cannot say that they are not to be judged by the same standard as private persons. The safety of navigation depends upon uniformity; only so can reliance be placed upon what masters see at night." (Italics supplied.) Ocean S. S. Co. v. U. S. (C.C.A.) 38 F.(2d) 782, 786. See, also, as to other naval vessels New England Maritime Co. v. U. S. (D.C.) 55 F. (2d) 674, particularly at page 677; New York & Cuba Mail S. S. Co. v. U. S. (D.C.) 300 F. 827; Id. (C.C.A.) 16 F.(2d) 945 (destroyer trial trip testing turbines); The Ozark (D.C.) 281 F. 281; Watts v. U. S. (D.C.) 123 F. 105; Thurlow v. U. S. (D. C.) 295 F. 905.

If merchant vessel captains are to judge of naval navigation by the conduct of those commanding the Chicago and her following column of cruisers, they may well express their attitude in Judge Hand's words, "As they now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates."

The other violation of the rules at the beginning of the maneuver to the collision consisted in the violation of International Rules, art. 16:

"A steam vessel hearing apparently forward of her beam, *the fog signal of a vessel the position of which is not ascertained shall*, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over." (Italics supplied.) 33 U.S.C.A. § 92.

When the fog whistle of the concealed Albion Star was first heard, her angle of emergence and hence position with reference to the Chicago's course had not been ascertained. Indeed, with the peculiarity of whistle direction in the fog (La Boyteaux, supra; Lie v. San Francisco & Portland S. S. Co., supra), the whistle might have come from a vessel in the left fog bank, and been deflected from the right. Instead of stopping her engines at once, the Chicago ordered them put at two-thirds or 12 knots speed, and continued ahead according to her engine room logs for nearly a minute.

■ No command is more imperative on a steam vessel proceeding in the fog than that instanter on her hearing the whistle of a concealed vessel forward of her beam the engines shall be stopped. As with the blowing of two whistles in violation of the rule, the regulation places upon the violator the severest burden of proof in collision cases. In the case of the Beaver-Selja collision this court condemned a vessel proceeding in a fog, *where the violation of the rule occurred 20 minutes before the collision.* The violator was condemned, although the opposing vessel admitted liability for maintaining, in a dense fog, a speed in excess of that claimed against the Silver Palm. The Beaver (C.C.A.9) 219 F. 134, 137.

The Supreme Court in affirming held, concerning violations of the stop engines of article 16, that: "The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator, discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a fog renders it not necessary to dwell upon the purpose and obvious wisdom of this second paragraph of the rule"; and the rule as to the burden of proof to be: "'Not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 296, 298, 37 S.Ct. 270, 272, 61 L.Ed. 726.

It cannot be contended with regard to the violation of this International Rule that the Chicago regarded her conduct as proper in a naval vessel. We come to this conclusion because, although the violation is clearly shown in the bell books contemporaneously recording the orders from the captain to the several turbines driving the ship, *it is omitted from all the several records*

*kept on the bridge of the vessel.* In the most important of these, the deck logbook, the entry as first written at the time that the fog signal of the concealed Albion Star was heard (8.01 o'clock), and when the first order of stop engines was not given but instead the engines ordered to proceed at two-thirds or 12 knots, *was erased,* and what would have been the proper order "all engines were ordered stopped" was inserted.

This alteration is not in an original entry, where haste may explain changes, though, even if then, it should have been made by leaving the original, under the naval rule forbidding erasures in the printed directions on the log in Exhibit 61, Book of Exhibits. The Ernest H. Meyer (C.C. A.) 84 F.(2d) 496, 503.

The deck log entries for the collision were composed with long deliberation. This is shown by the fact that space was left for the 8–12 watch entries and then the 12–16 entries made. The day is logged as 24 hours from midnight. Some time after the 8 hours from 8 a. m. to 4 p. m., the 7 minutes for the collision was written in the space before the 12–16 entries. It was not sufficient, and the writer had to jump around the 12–16 entries to complete one of the sentences in the deck claimed events before the collision. (Book of Exhibits, 51, 52.)

The importance of the logbook entries in determining marine causes has always been recognized by courts of admiralty. The alteration of logbooks by erasure and substitution (here, as later shown, in 9 pertinent entries of the maneuvers to the collision) has long been condemned in courts of admiralty. It not only casts suspicion on the whole case of the vessel, but creates a strong presumption that the erased matter was adverse to her contention. The Ernest H. Meyer (Broughton & Wiggins Navigation Co. v. Hammond Lumber Co.) (C.C.A.9) 84 F.(2d) 496, 503, 504 (erasure and substitution of entries); Cary-Davis Tug & Barge Co. v. United States (C.C.A.9) 8 F.(2d) 324, 325 (alteration); The Etruria (C.C.A.2) 147 F. 216, 217 (inserted entry); Pennell v. U. S. (D.C.) 162 F. 64, 70 (absence of entry); The Sicilian Prince (D.C.) 128 F. 133, 136, 137; The Richmond (D.C.) 114 F. 208, 212; Bunge v. The Utopia (D.C.) 1 F. 892, 908, 913 (failure to produce scrap log and contradiction between log and witnesses). In the Corinthian, 11 Asp. Maritime Cases (N.S.) 208, 211, an English judge says: " * * * Once you find there has been tampering with a log, as I have had occasion to say before in other cases, the court at once looks with suspicion at the whole matter."

The alteration at the time that the vessel's engines were ordered at 12 knots, when instead a stop engine order was entered, is peculiarly significant on a naval vessel. Under the Naval Regulations 1022, par. (1), "The *navigating officer* shall have charge of the preparation and care of the ship's log"; and "(3) He shall carefully examine the deck log book, see that it is prepared in accordance with Navy Regulations and instructions issued from time to time and call attention of the watch officers to any *inaccuracies or omissions in their entries.*" (Italics supplied.)

Under 1317 (3) "Any change or addition to the deck log must be made by the *officer in whose watch* the event under consideration occurred." (Italics supplied.)

Both the navigating officer and officer of the watch on the Chicago were on the bridge when International Rules, art. 16 (33 U.S.C.A. § 92), was violated by the 12-knot speed order on hearing the whistle of the concealed Albion Star. The entry is in the handwriting of the officer of the watch. Both signed the log with the omission and the alteration. The entry of the order from the bridge to the engine room to continue at the 12-knot speed contained in the bell books made impossible the concealment which may be properly inferred from the erasure. What may well have been erased is what the navigating officer stated in his report for the Naval Enquiry: "At 0800.1 the signal ahead two-thirds was rung and at eight-tenths of a minute after eight o'clock the signal 'stop' was rung." Book of Exhibits, page 64.

Another motive for the alteration and omission had to do with the speed of the Chicago when she sighted the Silver Palm. Had the stop order been given, the drag of the passing waters through the four huge and dead propellers would have aided in dropping her speed. Instead they were alive, drawing and throwing back the otherwise dragging water at 115 revolutions.

The conscientious and able proctor for the Chicago very properly pleaded the violation of article 16 in the Chicago's libel, instead of alleging compliance with the rule

by an order to stop engines: "Very shortly after 8.00 o'clock a. m. the navigating officer of the 'Chicago' heard the fog horn of a vessel on the 'Chicago's' starboard bow. The 'Chicago's' engines were *slowed,* then stopped." (Ap. p. 15.)

It is unnecessary for us to determine the immediate causative relation to the collision of these continuous violations of the International Rules while the Chicago was steaming in the traffic lane between San Pedro and San Francisco from midnight to the meeting of the two crossing merchant vessels and into the final maneuvers to the Silver Palm. It is true that, if the Chicago proved she had been proceeding at a moderate speed in the maneuvers leading to the collision and made no error in those maneuvers, she might escape liability. Dollar S. S. Line v. Matson Nav. Co. (C.C.A.9) 23 F.(2d) 554.

All this continued gross negligence from midnight until the maneuvers to the collision and, as is shown by the 18-knot speed given on her engines only 3 minues before the Silver Palm emerged, to the very heart of those maneuvers, during .all of which period of over 8 hours the Chicago was *always* violating one or another of the International regulations, and this concealment of the altered log (along with the many other alterations), have other pertinent relevancies. First it shows an established and continuing reckless disregard of the merchant ships in the traffic lane, even after one had become visible. Second, they had entrapped themselves by this recklessness. Three of their fellow officers were killed. A United States cruiser was cut nearly halfway through. In the evaluation of the testimony seeking to exculpate the cruiser from responsibility, by opinion as to her stopping power and distance, and recollections of visibility, both later considered, the subconscious tendency common to all human beings must be considered.

As Judge Learned Hand says, although they are officers of the Navy, "we cannot say they are not to be judged by the same standard as private persons." Ocean S. S. Co. v. U. S., supra, 38 F.(2d) 782, 786. The persons on this naval vessel are to be deemed no more immune to an impulse to defend the cruiser than those of merchant vessels. The Ernest H. Meyer (C.C.A.) 84 F.(2d) 496, 501, 502. We are entitled to deem appropriate the language of Circuit Judge Hutcheson in evaluating the conflicting testimony in a collision case, that "interest in a result" makes "thought wishful, tends to weave into the continuity of a complete narrative the substance of things hoped for, the evidence of things not seen." Nederlandsche, etc., v. Standard Oil Co. (C.C.A.5) 66 F.(2d) 113, 114.

**B. The stopping distance of the "Chicago" when she first sighted the Silver Palm was in excess of 475 yards. The alteration of the Chicago's bell entries and deck log, and the improper use of data for a test run of a sister ship as evidence for the federal courts, and offered as their "measuring rod."**

There is some confusion in the argument of the Chicago regarding the method of determining whether a vessel is maintaining a moderate speed in a fog. Great stress is laid on whether or not the Chicago was dead in the water prior to the collision. On the evidence we hold, with the admission of her libel (Ap. 16), that she had considerable forward motion in her. However, she could well be dead in the water and still at fault if she had crossed more than her allowable portion of visibility. Likewise, she could be liable for excessive speed, although struck by the opposing vessel before she had crossed her share of the visibility, since such excess would add to the force of the impact and thus contribute to the collision.

The real question is, What was the stopping distance of the Chicago when she first sighted the Silver Palm?

The determining evidence in this regard is an experiment made for the trial below by a sister ship, the cruiser Louisville. The test was under more severe conditions of discipline than the conditions prevailing around the Chicago's four turbine engines which drove her four propellers. All of the Chicago's orders to her engine room which had to do with her speed when the Silver Palm was sighted must have been recorded as the usual occurrences of a voyage up the Pacific.

On the Louisville, however, the men who operated the throttles controlling the steam going into the forward or reverse chambers of the turbines knew they were on a test and hence were "on their toes." We may properly infer that the orders would be executed, if anything, with greater rapidity on the Louisville, and that she would come to a stop after the orders

for reversing were given, in the shortest time and distance in which it could be accomplished.

The Chicago claims that the test of the Louisville did not include a right rudder on the Chicago, which to some extent would retard her speed and distance ahead. However, it is well known that the rudder deterrent is lessened when in the forward thrown waters of the reversing propellers (Rear Admiral, Ap. 359), and the retarding effect of the rudder in speeds of less than 12 knots is very small, in this case not over ½ knot an hour (Ap. 357). One knot an hour is 6,000 feet. Half a knot an hour is 3,000 feet. In a minute it is 50 feet. Deducting 50 feet, or 16⅔ yards, from the Louisville's 475 yards stopping distance would have no effect in preventing the collision with the Silver Palm.

The Louisville test is plotted very simply and clearly in the United States' Exhibit No. 5. In the four-minute vertical column it gives the speed of the Louisville, as shown by her Sal log, at 12 knots, when the reversing full speed astern began. The full reversing beginning at the fourth minute brought her to dead in the water in 1 minute and 55 seconds, during which last period she advanced 475 yards in the water.

The Chicago offers the Louisville test as the "measuring rod more capable of practicable application than any we can think of." (Appellee's brief, 57.) In this we concur, and agree that the Chicago was at a speed of *not less than* 12 knots when she saw the Silver Palm, and after attempting to change course, finally reversed. We further agree that it would require *at least* 475 yards to bring her dead in the water as she proceeded towards the Silver Palm.

We use the words "not less than" and "at least" advisedly. The government's brief asserts the measuring rod value of this test run, stating: "The 'Louisville's' run was not offered to the Court as an exact replica of the 'Chicago's' run. To offer an exact replica, it would have been necessary to have her make runs which repeated every combination of variation in the times reported by every record and witness—obviously an impossible thing to do. But it was possible to have her make a run on the basis of minimums. *Everyone would agree, we think, that the 'Chicago's' engine power was stopped at least two minutes, and that she then proceeded ahead for at least two minutes.* The 'Louisville', in making a run,

based on these two minimums, offered a measuring rod more capable of practicable application than any other that we could think of." (Italics supplied.) (Appellees' Brief, p. 57.)

Instead of driving the "Louisville's" turbines on the Chicago's *records of her turbine speeds,* the Louisville test was based on the *deck log* entries written up, as we have seen, more than 8 hours after the collision. These after-written deck log entries commence at 8.01, with the words "all engines stopped" over an erasure at the point where ⅔ ahead (12 knots) was ordered. They show a stop until 8.03; ahead ⅔ until 8.04; and full ahead (18 knots) at 8.05, for *one* minute, to 8.06, when the reverse was given.

The Louisville test begins with her speed at 18 knots. What was actually done on the Louisville to bring her to the 12-knot speed before reversing—that is, when the Silver Palm was sighted—was, first, a stop engine for 2 full minutes; then, ahead but 1 minute at ⅔ or 12 knots, and then ahead but 1 minute at full, the "Indicated" speed of 18 knots. That is, the "Louisville" test was based upon the Chicago's *deck log* entries.

*This is not what happened in these 4 minutes on the "Chicago" as shown by her turbine room bell book entries, even after they had been altered by erasures and favoring rewriting.* Even after favoring alteration these entries show that just before the reversing order the Chicago was proceeding for 2.5 minutes at 173 revolutions full ahead (instead of 1 minute), preceded by 1.1 minutes at ⅔. Preceding this was 1.6 minutes, in which the engines were stopped; before this .6 of a minute at 12 knots (reducing from 18), together 2.2 minutes, instead of the 2 minutes of uninterrupted stopping shown by the deck log (Exhibit 100, set forth infra).

Even as altered the Chicago's turbine bell records show that when the Silver Palm was sighted, and later the reverse order was received, the Chicago was going at a much faster speed than the Louisville, and hence would have covered much more than 475 yards towards the Silver Palm before she was dead in the water.

Tabulated for comparison, the greater period before the reversing order in which the Chicago's turbines were driven at 173 or full Indicated speed over those of the

"measuring rod" of the Louisville is clearly shown:

| What the "Chicago's" turbine throttlemen's entries show of the engine speed ahead just before seeing the "Silver Palm" (U.S.Ex. 100) | The 1.6 minute lesser time ahead prior to reversing on the "Louisville" test (U.S.Ex. 22) |
|---|---|
| 8-02.4 ) 1.1 min. at ⅔ speed 8-03.5 ) | 1 min. at ⅔-12 kt. speed |
| 8-06.0 2.5 min. at full speed until stop on seeing "Silver Palm" | 1 min. full ahead until reverse |
| 3.6 min. engines ahead | 2 min. engines ahead |

The tabulation of speed prior to going ahead shows the Chicago had not reduced her speed as much from 18 knots as had the Louisville.

| Chicago | Louisville |
|---|---|
| 8-00.1 .7 min. at ⅔ or 12 8-00.8) knot speed ) 1.6 min. at stop 8-02.4 | 2 min. at stop |
| 2.3 min. from 18 knots | 2 min. from 18 knots |

Since the Louisville test gave her 12 knots speed when she began reversing, the Chicago with 2.5 minutes at 173 revolutions or full Indicated speed, against 1 minute on the Louisville, could well have attained 15 knots speed when she saw the Silver Palm emerge from the fog ahead. The uninterested witness on the Albion Star, Capt. Capon, testified that at this time the Chicago had built up her speed to 15 or 16 knots. She had a high bow wave and seemed to be intending to overtake his vessel. (App. 1370, 1372.)

It follows that, since the Chicago was at a considerably higher speed when she saw the Silver Palm than the Louisville when she reversed, the Chicago would have taken much more than the Louisville's 475 yards, before the reversing and later emergency reverse brought her to a standstill.

No explanation has been given why naval officers should have a test of speed and stopping power of engines as a "measuring rod" *for the benefit of the federal courts,* based on the deck log rather than on the engine room entries showing what actually happened on the Chicago. What was done for the courts is entirely different from what was *prepared* for the Naval Enquiry. As we have pointed out, Navigating Officer Gray's statement *for his superiors* is based on the *turbine room logs* (Book of Ex., 64).

In this extraordinary situation, we find that the deck log, written up 8 hours after, was based upon the quartermaster's contemporary entries as to the collision in a scrap log in evidence (Ap. 1288). *This scrap log also was altered.* It shows an entry "0804 All engines ahead standard speed 18 knots 173 revolutions." The four engine room entries show at least 2½ minutes at this speed. The deck scrap log, after but 1 minute to 0805, shows the following extraordinary set of entries, all of them claimed to have been made just before and contemporaneous with the collision:

"0805 Stopped all engines.          to avoid
   (Emergency full speed astern) collision
0807 Collided with S. S. Silverpalm
   (British) Kerr Line, London England, Eng. on port bow (right rudder)."

The words "emergency full speed astern" are written over some entry that was erased. All five lines are close together.

The quartermaster's deposition shows (under cross-examination) that he denied, and then later admitted, the erasure and substitution. He insisted to the end that he wrote the second line, including its obvious inserted

to avoid
"/collision" "as soon as I thought we were going to collide."

We do not believe the testimony of this deposition that, before the collision with a clear space below on the page, he crowded into the small space at the end of the second line these three words. It is inherently improbable and followed his denial and later admission that he had altered the entries. Equally significant is the fact that the so-called scrap log omits the ⅔ ahead order when the Albion Star's whistle was heard.

Yet it was on a record, made up by the officer of the deck, from these obviously suspicious and, as the four bell books show, untruthful altered scrap log entries, that the data was given for the Louisville test trip to become evidence for this court as the Chicago's "measuring rod."

Like other significant log alterations covering the nine or ten minutes of the maneuver to the collision, this alteration was by erasure and substitution.

It is interesting to note the difference between the untried *theories* of the Chicago's officers and the *actual figures* of the Louisville test. Though with less speed than the Chicago at the start of the reverse, the Louisville *actually covered* 475 yards to a standstill, the left-hand table in Exhibit 100 shows. The Chicago's Navigation Officer Gray *figured* that with her higher initial speed she could reverse to a *dead stop in 373 yards!* Even smaller *estimates* were made by others on the Chicago. The "measuring rod" offered by the government makes curiously wrong their pages of expert testimony and justifies the quotation we have made above from Judge Hutcheson's opinion.

These figures of what happened on the Chicago are shown by the entries *made by the throttlemen who fed the steam* which made her speed. They were plotted on a tabulated diagram prepared by the Chicago's navigating officer for use *at the Naval Board of Enquiry.* The existence of this document was discovered on cross-examination. It was not in the courtroom, but was sent for and put in evidence by the Silver Palm, after all the other officers of the Chicago had concluded their testimony. It is significant that the Chicago recalled none to explain the difference between their theories, and the 475 yards stopping distance of the "Louisville" test plus the added distance due to an omitted first ⅔ ahead order and the 2½ minutes at full speed ahead on the Chicago (instead of the one minute on the Louisville) before the "Silver Palm" was sighted.

The tabulation is as follows:

The last line of the table shows the elapse of time between orders given by averages of the four turbines. This is standard practice. It was these averages which Navigating Officer Gray gave in his statement of the collision. There is a correction of time as to the two turbines, Nos. 3 and 4. All of the No. 3 entries are corrected by deducting .2 of a minute and all the No. 4 are advanced .4 of a minute. This was because of a difference in the clocks. The time consumed in the execution of the orders remains the same. In this connection it should be noted that a single movement of the lever on the bridge rings all four bells at once.

An examination of the Chicago's turbine room entries shows that *they also were significantly altered,* both as to time of the entry and the number of revolutions to the next order, and hence time elapsed under the orders. These alterations on the turbine logs are of the figures next the inserted stars on Navigating Officer Gray's tabulation, supra.

The No. 1 turbine entry (43 Book of Ex.) is unaltered. It shows 4 minutes between "0803 I," that is the 18 knots speed order, and 0807 F. B., the reversing order. Likewise 4 minutes at revolutions of 18 knots between 0803 and 0807 on the No. 2 turbine (46 Book of Ex.).

On the Nos. 3 and 4 engines the time of both entries for the reversing orders are altered. On the No. 3 engine the full ahead I is at 0805 and the full reverse at 0807. Under the 7 clearly appears an 8, partially erased.[2] On cross-examination, this tur-

| Place Where Logged / Engine Signal | From Standard to Ahead 2/3(12) | Stop | Ahead 2/3 (12) | Ahead Standard | Stop | Back Full | Emergency Back Full | Collision | Back 1/3 |
|---|---|---|---|---|---|---|---|---|---|
| Quartermasters Note Book | | 0801 | 0803 | 0804 | | | 0805 | 0807 | |
| O.O.D. Log | | 0801 | 0803 | 0804 | | | 0805 | 0807 | |
| #1 Engine Time | 0800 | 0801 | 0802 | 0803 | 0806 | 0807 | 0807 | | 0808 |
| #1 Engine Counter | 000575 | 000790 | 000790 | 000900 | 001240 | 001260 | 001464 | | 001464 |
| #1 Engine R.P.M. | 115 | | 115 | 173 | | 110 | 120 | | 35 |
| #2 Engine Time | 0800 | 0800 | 0803 | 0803 | | | 0807 | | 0808 |
| #2 Engine Counter | 007070 | 007075 | 007171 | 007240 | | | 007690 | | 007920 |
| #2 Engine R.P.M. | 115 | | 115 | 173 | | | 110 | | 35 |
| #3 Engine Time | | 08-00.8 0801 | 08-02.8 0803 | 08-04.8 0805 | | | 08-06.8 0807 * | | 08-07.8 0809 |
| #3 Engine Counter | | 945010 | 945300 | 945400 | Corrected Time | | 945700 | | 945860 |
| #3 Engine R.P.M. | | | 115 | 173 | | | 110 | | 35 |
| #4 Engine Time | 08-00.4 0800 | 08-01.4 0801 | 08-02.4 0802 | 08-03.4 0803 | | 08-05.4 0805 | 08-05.4 0805 * | | 06-07.4 .0807 |
| #4 Engine Counter | 987615 | 988067 | 988067 | 988130 | | 988527* | 988582* | | 988721 |
| #4 Engine R.P.M. | 115 | | 115 | 173 | | | | | |
| B.R.Average Time | 08-00.1 | 08-00.8 | 08-02.4 | 08-03.5 | 08-06.0 | 08-06.2 | 08-06.6 | 0807 | 08-07.8 |

²The inserted 5 stars in the columns marked Back Full and Emergency Back Full are opposite the erasures and substituted figures on the turbine logs upon which this table is based.

2 Resp.Ex. 7, Orig.Entries, p. 6, Book of Ex. p. 46.

bine man said he had no memory of the alteration.

On the No. 4 engine the full speed is entered at 0803 for 18 knots and the full astern but 2 minutes later, at 0805. The "5" is clearly over an erasure. Also the engine revolutions for the period ahead and reversing are altered over erasures.[3] With such obvious alterations, the Chicago failed to take the deposition of this throttleman before he left the vessel.

The averages of this set of four entries are what give Navigating Officer Gray's figures of 2½ minutes ahead. It is apparent that what he should have taken was the 4 minutes at 18 knots speed of the two unaltered 1 and 2 records and omitted the other two.

This applied to the Louisville test would give four times the period of full speed with which the 'Chicago hastened to pass within 300 yards of the fog bank, from which she saw the Silver Palm emerge. We conclude that at that time the Chicago's speed had attained around 15 knots instead of the 12 knots at which the Louisville reversed, and find that the Chicago's stopping distance must have been greatly in excess of the 475 yards at which the Louisville became dead in the water.

**C. The distance between the Chicago and the Silver Palm when the latter was sighted was 700 yards. Other significant alterations of the deck log. Assuming the Chicago's stopping distance was but 475 yards her speed was excessive.**

The cruiser Chicago knew herself to be sufficiently distant from the shore not to be concerned with any menace of the coast headlands. The only possible menace to her navigation and, incidentally, others to whom she was a menace, consisted in the vessels on the route between San Francisco and San Pedro, which could have been invisible to her in any one of the banks of fog on her starboard and port sides. These were rolling banks of fog, those on the port side crossing the Chicago's course of 350 true at about a 40 degree angle from port to starboard in a west northwest wind of 12 knots velocity; that is to say, 1,200

feet a minute. (Deck Officer, Lt. Minter, Ap. 281.)

The next question in determining the charge of her contributive fault is the Chicago's navigational visibility. By navigational visibility, we mean visibility as affecting her speed with reference to the distance within which she could be brought to a stop in the water, before *any* course of *any* vessel emerging from the fog on either side would cross her projected course alongside the fog bank at its nearest point.

A part of the contradiction in the testimony of the Chicago's officers arises from a confusion between the visibility through the intervening spaces between the fog banks and the visible distance from the nearest point on her course directly to the nearest fog bank, which might contain the concealed steamer or steamers on their voyage between the two California ports. Certain of the testimony given, to the effect that looking between fog banks one could see a mile ahead, is entirely irrelevant to the discussion of the proper speed to be maintained by the cruiser. This is illustrated on Diagram 1.

Wind at 1200 ft. per minute (Tr. 281) driving fog across course and down on Chicago as indicated by arrow.

Diagram 1.

[3] Resp.Ex. 7, Orig.Entries p. 7, Book of Ex. 47.

If the Chicago's course was within 383 yards of fog bank A on her right, she ran the risk of seeing a vessel emerge from point V in bank A at right angles to her course. The Chicago would then be but 383 yards from the point of intersection of courses (point I). This required her speed to be such that she could stop dead in the water in less than 383 yards.

The same principle required a speed at V' at which she could stop dead in the water in less than 239 yards (distance to point of intersection of courses, I').

No case represents better than this the duty of a vessel at times in the fog herself, but always navigating in the presence of fog banks ahead on her port and starboard sides, the port banks driven by the wind across her course, to control her navigation in anticipation that each bank contains the hidden menace of a crossing vessel which might suddenly emerge with the threat of collision.

In this case a fog bank which lay on the Chicago's starboard side was blown away by the crossing wind to reveal the Albion Star, appearing suddenly at a point *at most* (giving full value to an overwritten entry in the deck log) not over 383 yards to the starboard of the projected course of the Chicago; while just ahead on her course, and on the Chicago's port side, another fog bank moving towards her course concealed the Silver Palm, which emerged at a point *at most* not over 383 yards from the Chicago's projected course.

These distances are easily determinable by a very simple geometric calculation. The Albion Star emerged from the fog bank, according to an overwritten entry in the Chicago's log book, 1,000 feet distant. It is agreed she was 2 points 22½ degrees to the Chicago's starboard. We thus have a right angle triangle of which the hypotenuse is the 1,000 feet visibility, the base the course of the vessel with an angle of 2 points, or 22½ degrees between it and the hypotenuse. The third line perpendicular to the course towards the Albion Star is easily determined. The length of this third perpendicular line is the distance of the Chicago's course from the left fog bank. Similarly as to the left fog bank. The log shows the Silver Palm emerged 20 degrees off the Chicago's port bow at a distance of 700 yards. The Chicago's course could not have been more than 239 yards off the left fog bank with the 12-knot wind blowing it constantly closer.

X—X Chicago's course.
Line C.—E. distance, 1,000 yards, from Chicago to point in fog bank at which Albion Star emerged.
A angle, two points, between course and line of vision C—E.
O nearest point of course to fog bank.
O—E at right angles to course, 383 yards. (Bowditch Am. Nav., p. 447).
Similarly the distance from the Chicago's course to the point in the fog at which the Silver Palm emerged is 239 yards. (Bowditch, p. 494.)

It is not a case of afterwisdom in judging the conduct of the Chicago with reference to these vessels which actually emerged. The cases hold that the obligation of a vessel to maintain a moderate speed while navigating next to the fog banks, a fortiori next those on one side blown across her course, from which crossing vessels may emerge, is the same as when the vessel herself is actually in the fog. The Silvanus (D.C.) 56 F.(2d) 257, 260, affirmed sub. nom. The Thomas H. Wheeler (C.C.A.5) 66 F.(2d) 113; The Munalbro (D.C.Mass.) 280 F. 224, 226; The William H. Taylor (C.C.A.2) 278 F. 717, 719, certiorari denied The William H. Taylor v. Standard Oil Co., 258 U.S. 629, 42 S.Ct. 461, 66 L.Ed. 799; The Papoose (C.C.A. 2) 85 F.(2d) 54, 55; The Edward E. Loomis (C.C.A.2) 86 F.(2d) 705, 708.

Without the authority of these cases, the prudent navigation required by Internation-

al Rules, art. 16, imposes the obligation to proceed at a speed which will enable the vessel to come to a stop in the water prior to the point where the possible emerging vessel may cross her. course; that is, 383 yards for the right and 239 yards for the left fog bank.

We first consider the evidence of the distance between the two vessels from the logs. Although it was evident that a severe naval inquiry was pending over those concerned with the navigation of the Chicago, some of the original entries upon a paper used by the officer making up the log were not preserved. . Instead, at least 8 hours later, an account of what had happened in the watch between 8 and 9 o'clock, composed in part from these now absent original entries, was written on the ship's deck log. We have already shown the alteration of that log at the time the two-whistle order was faultily given and the absence of that order from any deck log entry, and the alteration of the scrap log from which, in part, the deck log is composed.

Here again we are confronted with two other alterations of the log as to entries in the column provided to record the visibility under which the vessel's speed should have been determined in the hourly period just before and at the beginning of the collision maneuvers.

The alterations are by erasure and substitution. (U.S.Ex. 1, Bk. of Ex. [photostat]; Original log, Resp.Ex. 5; Libelants' Ex. 5, Depo.Ladd, 1314.)

In the column headed Visibility, the entries from midnight to 6 o'clock are zero "0," which the printed schedule on the logbook designates as "Prominent objects not visible at 50 yards." This means that for no substantial period in each hour was there greater visibility.

When we come to the 6 to 7 o'clock entry, we find it altered in a handwriting strikingly different from any other in the twelve hours from midnight on. There are fifteen entries for each hour of the four-hour watch. These cover the speeds by revolutions and by the sal log in the bridge or the trailing log, course, wind, barometer, temperature, weather, clouds, sea, and visibility. For the 12–4 watch the sixty entries are all in one handwriting. For the 4 to 8 watch fifty-eight are in one handwriting and the two remaining are in another.

This intruding handwriting of the two alien entries is as to the visibility from 6 to 7 and 7 to 8 o'clock. They are written over erased original entries, undoubtedly of the handwriting of the other 58 entries of the 4 to 8 watch. The alteration for 6 to 7 o'clock is now .2 or 200 yards of extreme visibility.

The printed "Directions" on the second page of the logbook provide that ".1" indicates 100 yards extreme visibility, ".2" indicates 200 yards, the table adding 100 yards for each unit increase in the decimal figure up to 1,000 yards.

We cannot tell what was erased under the .2 finally written. Possibly there was a double erasure, for some of the impressions of the erased matter are in the peculiar vertical figures of the final entry. Under the long-established rule of interpretation (cases cited supra), we are required to assume the entry was of less than 200 yards extreme navigable visibility for the hour. We assume it was a zero, as in the preceding 6 hours. It was at 7.26 that the Vice-Admiral found the fog had somewhat lightened.

The next alteration is on a matter of vital importance to this case. The maneuver to the collision began just before the 8–12 watch, with its change of officers on the bridge at 8'clock. The extreme visibility at the end of this 4–8 watch, when the Chicago was steaming at 18 knots along the "edge" of the fog bank on her left, is of high probative value in determining the culpability of her navigators in her approach to her two invisible opponents.

The 7–8 entry as it is now altered gives .3–.7 as the extreme visibility of that period; that is, up to hearing the fog whistle of the Albion Star. The remnants of what was erased appear to be the terminals of the figures .2 and .3 left after partial erasing. That is, the original entry was for from 200 to 300 yards. These are clearer in the log itself than on the photostat, the Chicago's Exhibit 1. Three hundred yards, we are entitled to assume, was the extreme navigable distance created by the approaching left fog bank on her weather side, along which the Chicago's course was edging. This required interpretation fits into the testimony of the foretop lookout, who was actually in the fog and said that it covered the bridge, and of the quartermaster, who said the visibility when the Silver Palm emerged was 250 yards. It also corresponds with the navigable visibility as we deduce it from the officers' testimony.

Coming to the entries of the "Visibility" column in the 8–12 watch. These are in the same handwriting of the altered entries of the last two hours of the preceding watch. They are also utterly unlike the handwriting of the fifty-six other entries for the four hours to 12 o'clock. It is a proper inference from the continuity of handwriting of the two altered entries for the 6 and the 7 o'clock periods through those of the succeeding watch that the other fifty-six entries of this watch were made contemporaneously and the visibility column left blank for *afterwise* and helpful entries.

The question may be raised why these afterentries were not put at higher distances than they were. The engine room bell records and scratch log show too many stops and ⅓ speeds and reversing indicating heavy fog conditions all during the watch. In the next watch, 12–4, the four visibility entries are in the handwriting of the other 56 entries.

The deck log shows two other entries on the question of visibility. One is an overwritten entry after "8.01" a. m., showing the distance to the point in the fog on the Chicago's right at which the Albion Star emerged. What was written underneath the present entry we cannot determine. It appears as though it might have been 700 yards, though this may not be any more than a rewriting for clarity. As the entry stands, it is 1,000 yards. The Chicago's captain gives the angle from the course of the ship at 2 points, or 22½ degrees, on his right bow.

By the simple calculation we have before outlined this would make the distance of the Chicago's course from the right-hand fog bank something in the neighborhood of 383 yards, which would require that she should be proceeding at a speed which would enable her to stop dead in the water within 383 yards.

A similar situation was presented to the Circuit Court of Appeals in the case of The Papoose. There a Navy aeroplane carrier was proceeding, as here, along the edge of such a fog bank 300 yards distant at a reduced speed of 4 knots. The propriety and necessity for a 4-knot speed was not questioned, the pertinent part of that case being that the captain of the aeroplane carrier thought it was the proper speed to be maintained while edging along a fog bank so close on her left, and the holding of the court that when passing along beside and within such a distance of a fog bank

she was governed by the International Rules for fog conditions. The vessel was held at fault for not blowing her fog signals. The Papoose (C.C.A.2) 85 F.(2d) 54, 55.

There is no question that the Chicago intended to pass within 383 yards of the right fog bank at 18 knots, and would have done so and there met a vessel emerging 383 yards distant, if she had not been fortunate enough to hear the whistle of the Albion Star. That vessel caused her to drop her speed to ⅔ and then to stop engines, but a careful study of the evidence makes it clear that the approach to the right fog bank at all times was in violation of the International Rules, art. 16, 33 U. S.C.A. § 92, requiring moderate speed.

The Albion Star had a converging course and the Chicago turned from her 350 degrees true to 330 degrees true, towards the fog bank on her left. She intended to approach and pass that fog bank at a speed of 18 knots, for she gave first an order of ⅔ ahead or 12 knots on the engines and in a minute increased it to the indicated speed of 18 knots of the 4 hours run to bake the new surfacing on her boilers. In view of the conclusions we have reached, it is not necessary for us to hold that, because the Chicago was pressing her engines to bring her speed up to this totally inexcusable figure of 18 knots, it would throw on her the burden of proof that she had not proximately contributed to the collision, though it might be well that such a burden of proof be thrown on vessels showing such reckless animus.

On seeing the Albion Star, the Chicago altered her course from 350 degrees true to 330 degrees true. The evidence does not show the vertical distance that the Chicago traveled to her left when the Silver Palm suddenly emerged into vision ahead off her port bow.

There is one unquestionably unaltered entry in the deck logbook made up in quiet deliberation after the immediate events of the collision had passed. It is that the distance at which the Silver Palm appeared ahead was 700 yards. The brief of the United States discloses the angle to the point in the fog where the Silver Palm emerged, "as about 20 degrees on the Chicago's port bow." We may take it that this unaltered entry as to distance was what the navigating officer, Lieutenant Commander Gray, and Lieut. R. O. Minter, who signed the log, estimated the distance at the period when their memory was freshest

after the event. Capt. Kays who navigated his vessel with reference to this distance, and had faced the Naval Enquiry, and now facing his vessel's responsibility in an admiralty court, certainly would not be prone to minimize it. He states that the Silver Palm was "between seven and eight hundred yards away," when he says he saw it, and he gives the angle from the vessel's course at 20 degrees. (Ap. 153.)

Lieut. Minter, who was on board the Chicago as "Scout force, aerological officer, and deck watch officer," stated that he estimated the distance of the Silver Palm from the Chicago at the moment he sighted her at 700 yards, thus agreeing with the log that he prepared and signed. Lieutenant Commander Gray, the navigating officer on the bridge, who also signed the log with its statement of 700 yards, when it came to the hearing, gave his estimate as 700 yards, 200 up or down either way (Ap. 1131.) The Rear Admiral, also on the bridge, estimates the distance as between 700 and 900 yards, while the Vice-Admiral gave it as between 800 and 900.

We thus find that there is nothing in the testimony of any of the commissioned officers which supports the District Court's finding of 1000 yards distance to the Silver Palm when she was sighted.

Assuming the testimony of those whose estimates controlled her actual navigation and hence the result of keener concentration, are equal in value with the others, the average of the officers' estimates is 780 yards.

The lookout on the foretop gave the distance to the fog bank and emerging Silver Palm as 600 yards. (Ap. 415.) At that time there was fog both on the bridge and foretop. (Ap. 419.) The lookout on the port side of the bridge testified that he could not tell the exact distance, either to the Albion Star or the Silver Palm. His explanation was that "the fog was stealing down pretty bad over the whole area where we were * * * all around us, and we were in a pretty bad place, I guess, that is all." Quartermaster Ladd on the bridge says: "I saw the 'Silver Palm' when she first emerged from the fog about 250 yards away." (Bk. of Ex. 75.) This was after the visibility had "decreased very rapidly; fog banks were coming in." (Ap. 1295.)

These three witnesses' testimony of the fog which the westerly wind was blowing over the ship justify the strongest presumption from the two alterations of the log entries on visibility.

The lookout on the starboard side estimated the distance of the Silver Palm at 1,000 yards. One of the lookouts on the bow claimed he could remember nothing about the distance to the Silver Palm which it was his duty to observe. He was plainly embarrassed when pressed. The other bow lookout gave the distance as 1,000 yards. So far as the latter's testimony is concerned, we feel that his estimates of distance cannot be seriously offered by the Chicago. If correct, they are sufficient to condemn the vessel without further testimony, because he said that the Chicago proceeded under 18 knots engine orders until the distance between the two vessels was but 75 to 100 yards, before the Chicago reversed her engines. (Leed's statement before Board of Enquiry, Ex.Bk. 77.)

When we consider the presumption from the three (if not four) pertinent deck log alterations and the fact that Capt. Kays commanded the ship on an estimate of 700 yards between himself and the Silver Palm, and the unaltered deck log entry of 700 yards, we are constrained to hold that the distance between the Silver Palm and the Chicago, when the former was first sighted, was not in excess of 700 yards.

The Chicago's share of this distance is 350 yards. Since we have found the Chicago's stopping distance was considerably in excess of 475 yards, she violated the first paragraph of article 16 and the violation proximately contributed to the collision.

The decree is affirmed in so far as it concerns the uncontested liability of the Silver Palm. Since the Chicago was equally at fault, the decree, in so far as it holds her not liable, is reversed.

### On Petition for Rehearing.

(A) The petition for rehearing seeks to justify the use of the deck log entries with their significant erasive alteration and final omission of the two-thirds ahead order at 0801 in the "measuring rod" test run of the Louisville. The Chicago contends that the deck log record of turbine room orders, not entered until at least 8 hours after the collision and made up from memory, unproduced writing on slips of paper, and another book's record, also altered by erasure, should be the basis of the test run instead of the contemporaneous entries of the men operating the Chicago's four turbines and actually supplying them the steam for their propulsion.

The contention we cannot accept. The contemporaneous entries of the four turbine

772

bell sheets were the proper basis for determining the Chicago's maneuvers for the test run of the Louisville. The tabulation of these entries was made in proper form by the Chicago's Navigating Officer Gray for the use of the Board of Naval Enquiry. True, he took the final entries over the erasures, but the long-established presumption is that what was erased would be even more unfavorable to the Chicago.

The diagram of the Louisville's maneuvers offered by the Chicago to sustain its "measuring rod" theory is photostated as follows:

The diagram is easy to interpret. The horizontal lines show the revolutions at the successive changes as the maneuver proceeds, while the vertical lines rise from the elapsed minutes of the test run. On the diagram the line marked "RPM," meaning "Revolutions per Minute," and beginning at horizontal line 173 on the left-hand side, records, as it crosses the horizontal lines, the number of revolutions indicated on the left-hand side of the diagram.

It is not contradicted that the first minute of the diagram, where the vessel at 18 knots through the water begins the test

run under a "stop" engine order, does not show the ⅔ ahead order given before the stop order. This ⅔ ahead order would more gradually reduce the speed as the four propellers drove ahead at 120 revolutions. The RPM line, when it had dropped to reach the 2 minute vertical line, instead of being at 70 revolutions, would have been at a somewhat higher number of revolutions had the Louisville given the ⅔ ahead order actually given on the Chicago instead of the erroneous stop order at the beginning of the maneuver.

On the 2 minute vertical line begins the ahead ⅔ maneuver, which continues for 1 minute, at which the RPM line rises to cross the 3 minute line where it coincides with the horizontal 100 revolution line. The RPM line would have been higher on the 3 minute line and hence at a higher number of revolutions had the first ⅔ ahead order not have been omitted.

Continuing from where the RPM line crosses the intersection of the 100 revolutions and the 3 minute line, the "full ahead" standard order began its execution. On the Louisville this continued for but 1 minute, in which time the RPM line arrived at the horizontal 132 revolution line, where the Louisville gave the full astern order. Had the first ⅔ ahead order not been omitted in the first minute, the number of revolutions reached on the Louisville would have been higher than 132 at the end of the first minute of the full ahead order.

Here is where begins the second marked divergence between what happened on the Chicago's turbines and those in the Louisville test. The Chicago's Navigating Officer at the time of the collision, Lieutenant Commander Gray, prepared his tabulation of the turbine maneuvers of the Chicago from the time she dropped from her 18 knots through the water at 173 revolutions at about 8 o'clock a. m. Our comment on the introduction of this tabulation in the second sentence from the last on page 30 of the original opinion, 94 F.2d 766, should read: "It was not in the courtroom, but was sent for and put in evidence by the Silver Palm, after all the other officers on the Chicago had concluded their testimony. It is significant that the Chicago recalled none to explain the difference between their theories, and the 475 yards stopping distance of the Louisville test plus the added distance due to an omitted first ⅔ ahead order and the 2½ minutes at full speed ahead on the Chicago (instead of the 1 minute in the Louisville) before the Silver Palm was sighted," and the clerk

is instructed to make it so appear on the face of the opinion.

On the Chicago her navigating officer's tabulation shows that the four turbines continued ahead, for an average of the four, for another minute and one-half. That is to say, the RPM instead of falling under a reverse, on the 4 minute line, would have continued to rise to the 5½ minute vertical line from considerably more than 132 revolutions to a much higher figure. How far this rise in revolutions would be in the additional minute and one-half or 150 per cent. in time over the previous minute at full ahead, the testimony does not show. We accept it as a reasonable inference that the number of revolutions reached would be well towards 160 before the Silver Palm was seen and the full reverse given.

The diagram shows that the distance traveled before the Louisville came to a stop, after omitting the ⅔ ahead order in the first minute, and failing to give the additional minute and one-half ahead before the reverse order, covered 475 yards. It is hence a rational inference, which we adopt, that the Louisville (and hence the Chicago) would have covered much more than the 475 yards and quite reasonably nearly 600 yards before she came to a stop, had she added to her test the first ⅔ ahead and the 1½ minutes at full ahead of the Chicago's actual maneuvers.

It is thus apparent that taking the Louisville test as a basis and applying to it the figures of the Navigating Officer Gray, the stopping distance of the Chicago, when she was straining to attain a reckless 18 knots in passing a fog bank less than 300 yards distant, was nearly, or in fact, 600 yards at the time the Silver Palm was sighted.

We are hence constrained to hold, against the petition for rehearing, that the Chicago was proceeding at excessive speed in the fog banks when the Silver Palm was sighted and was acting under an intent to reach a speed grossly in excess of moderate.

(B) The petition for rehearing asks us to accept the testimony of the bow lookout that the visibility from the Chicago in the direction of the Silver Palm was 1,000 yards when the latter was sighted. However, if we were to accept the accuracy of the bow lookout's measure of distances, the cruiser would be condemned because her stopping distance was in excess of the one-half of the 1,000 yards. As the opinion points out, we would be required also to

accept his testimony that the reverse order was not given on the Chicago until the two vessels were within 75 to 100 yards of one another. Book of Exhibits, page 77, offered by the Chicago. We cannot accept this testimony against the unaltered entry of 700 yards of the deck logbook entered with deliberation 8 hours after the collision.

The petition complains that we regard the deliberation with which the deck log entry was made as a fault. On the contrary, the United States statute, 46 U.S. C.A. § 201 (12), requires such a full and deliberate statement of the facts leading to the collision to be made in the vessel's log. We feel that the distance of 700 yards so deliberately entered has strong probative value in the case because of this deliberation and because of the signature of Lieutenant Commander Gray, her navigating officer, and of Lieutenant Minter to the deck log entries. This log entry is supported by the other testimony we have summarized in our opinion.

(C) The petition for rehearing seeks a ruling that the erasures and substitutions in the four turbine bell books, the deck log, and quartermaster's book do not invoke the presumption established in the cases cited in our opinion.

All the 8 alterations noted in the several logs have to do with the action of the ship as affecting the 7 minutes of maneuver to the collision and her speed prior thereto. Alterations by erasure are forbidden in the navy, the exhibit referred to in our opinion requiring any change to be made in the margin of the book of entry.

None of these alterations in significant moments with reference to the claim of fault on the part of the Chicago requires the microscope for its discovery. All were plainly visible to the eyes of the three judges, and must have been to the Chicago's proctor when they were introduced in evidence.

A re-examination of the pages on which these erasures and substitutions are made show that, in hundreds of other entries on the pages in question, there is no alteration by erasure as to any other than those affecting the responsibility of the cruiser for the collision.

The petition for rehearing makes the extraordinary claim that the three judges should ignore all these significant alterations in the cruiser's entries except those which were brought explicitly to the cruiser's attention at some place in the trial.

We do not so understand the rule recognized in the many cases cited in our opinion establishing the presumption arising from significant log alterations in the maneuvers of the vessel which has been challenged.

However, in a trial de novo in admiralty on appeal, it is within the court's discretion to permit further testimony if evidence tending to cause the court's decision has failed, through excusable inadvertence, to receive the consideration of one of the parties. If, in a case of such importance as this, the cruiser's petition had offered to explain by adequate evidence the reason for the erasive alterations, it would have been strong persuasion on us to receive it.

We can find no rational explanation favorable to the Chicago for the following alterations:

1. In the cruiser's exhibit on page 1 of the Exhibit Book, photostat copy of page A of the log book, marked Libelant's (U.S.) Exhibit No. 3, Depo. Ladd, under which the whole log book was offered by the cruiser's counsel, along with the deposition, the obvious erasure-alteration in different handwriting of the visibility entry in the hour from 6 to 7, shortly before the 18 knot speed was given, or the erasive alteration in the hour from 7 to 8, just before the maneuvers to the collision. We find no alteration by erasure and substitution in the 300-odd entries on this page, other than these significant ones concerning visibility.

2. The alteration on the next page of the log book, page B, clearly seen in the original log, after the entry 0801, where, over an erasure, is entered "All engines were ordered stopped," instead of the omitted ⅔ ahead order. This last order was given in violation of International Rules, art. 16, 33 U.S.C.A. § 92, the previous entry being that the exact bearing of the Albion Star's fog signal was "uncertain." It does not explain the *erasure* and *substitution* to say that the officer making the entry might not have heard the ⅔ order. This does not answer the question: "Why the erasure and substitution?"

The significance of this erasure of what we are entitled to presume was the ⅔ ahead order and the substitution of the stop engine order, appears when we consider that it was upon these deck entries that the Louisville "measuring rod" maneuvers were made. This ⅔ ahead at the beginning of the maneuvers to the collision is omitted

from the Louisville run. If it had been in the deck log and performed by the Louisville, it would have significantly added to the speed of the cruiser at the moment when the Silver Palm was sighted and hence to the length of her stopping distance under a full reverse thereafter.

3. No explanation is given of the alteration by erasure and overwriting of the 1,-000 yards distance at which the Albion Star was seen, the alteration being in the fourth line below the alteration at entry 0801 last referred to. This alteration is of lesser probative significance, but subject to the comment of our opinion.

4. Coming to the alterations of the entries of the four turbine men, upon which the calculation of the ship's speed are determined, Captain Kays, the Chicago's commander, testifies:

"Q. In reconstructing what occurred that morning, from your own recollection of it, would you say that your present estimate that the 'Chicago' arrived at a speed of 18 knots not before 8 o'clock, but about 8 o'clock would be more to be relied upon than the records of your engine room? A. The *records* of the engine room would be *better than my observation of it.*

"Q. The engine room log would in fact give us the time at which the 'Chicago' arrived at a speed of 18 knots? A. Yes, *they* should show that more exactly than my observation." (Emphasis supplied.) (Tr. 172.)

Among these alterations are the alteration of the engineer's bell sheet for the No. 2 turbine, Exhibit 1 Smith, on page 46 of the Book of Exhibits. The black photostat shows the alteration of the number of revolutions in the 4 minutes from 0803 to 0807 at full ahead just prior to sighting the Silver Palm. What appears to be another figure is partially erased and a 6 written over the revolution counter entry at 0807. The only other alteration of the 200-odd entries on this page is properly made without erasure, by striking a line through the entry and restating it below.

This alteration was called to the attention of the cruiser's proctor after Throttleman Smith had testified (Tr. 439), but Smith was not recalled to explain it.

Smith was the lead throttleman. His previous testimony is significant with regard to all these engine entries. It was suggested that since the order was executed before the revolution entry, the entry might miss some revolution in the execution period. Smith states:

"Q. The entry which shows the status of the revolution counter at any particular time is the number of revolutions that have been made at the time of the entry, isn't that right? A. Right.

"Q. And again it does not show the number of revolutions that were made at the time of the order? A. There is such a small variation in time that we have never been forced to record it that way." (Tr. 1241.)

5. The alteration of the engineer's bell sheet of the No. 3 turbine, photostat copy on page 47 of the Book of Exhibits, where the interval between 0805 and 0808 is shortened by writing a 7 over the partially erased 8. The significance of this alteration is that it takes 1 minute off the period that the Chicago went full speed ahead on this turbine, which would give materially less speed to her at 0808, when the Silver Palm was sighted and the full astern order was given, than was actually allowed. The throttleman agrees there is an alteration, but cannot state whether or not he made it.

We can find no other alteration by erasure in the 300-odd entries on this page of the bell sheets.

6. Engineer's bell sheet for No. 4 turbine, photostat copy page 49 Book of Exhibits, at what appears to be 0805 reverse full, something under the 5 has been erased and the 5 substituted. An entry just under it, another 0805 for the double reverse, has had something erased and something substituted. This gives but 2 minutes of full speed ahead, since the full speed order was given at an unaltered 0803. The two other *unaltered* time entries for the two other turbines give the period between the full ahead at 18 knots and the reverse as *4* minutes.

Both the revolution counts opposite the two altered 0805s are altered by erasure and substitution. We are unable to find any other alteration by erasure in the 300-odd entries on this page other than the significant entries determining the speed of the vessel at the time the Silver Palm was sighted and the reverse was given.

Although there are four erasive alterations at the 0805 entries, the throttleman who then had charge of the entries was not produced or his deposition taken before he left the ship. No search for him was made other than writing a (returned) letter to an address left by him.

Since the alterations appear not in the deck log alone, as in most of the cases establishing the presumption, but in all *five* of the deck and separately kept engine room sheets, a fortiori seems the right of the Silver Palm to claim the presumption against the cruiser.

(D) The petition for rehearing suggests that there is some explanation for the gross violation by the Chicago of the prudent navigation and other International rules, continuing from at least midnight until the collision. It does not state what the explanation may be, or ask to offer further evidence, but it is pertinent to observe that all our findings regarding the continuous menace to navigation of the Chicago and her following fleet of cruisers are based upon the testimony of her Admiral, offered by the Chicago and the log entries offered by the Chicago. These show that at the time of the collision the Chicago was "possessed" by a spirit of reckless disregard of other vessels in the steaming lane between San Francisco and San Pedro. The prior *maneuvers,* while in this "possession," in themselves did not causatively contribute to the collision. The spirit they evidenced, still controlling the cruiser as she steamed through the fog banks, was, in a true sense of seamen's psychology, its causa causans.

Petition for rehearing denied.